**DRUG MART PHARMACY CORP.,**
et al., Plaintiffs,

v.

**AMERICAN HOME PRODUCTS
CORP., et al., Defendants.**

No. 93–CV–5148 (ILG).

United States District Court,
E.D. New York.

Jan. 25, 2007.

Mary McInnis Boies, Mary Boise & Associates, Empire Building, Bedford, NY, Nicholas A. Gravante, Jr., Steven I. Froot, Philip J. Iovieno, David A. Barrett, Boies, Schiller & Flexner LLP, New York City, Durrette Bradshaw, PLC, Wyatt B. Durrette, Jr., Kenneth D. McArthur, Jr., Richmond, VA, for Plaintiffs.

Wayne A. Cross, Robert A. Milne, Michael J. Gallagher, White & Case LLP, New York City, for Defendant Ciba–Geigy Corporation.

Saul P. Morgenstern, David S. Copeland, Robert Grass, Kaye Scholer LLP, New York City, John Treece, Craig B. Sonnenschein, Sidley Austin Brown & Wood, Chicago, IL, for Defendant G.D. Searle & Co.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

### INTRODUCTION

Pending before the Court are four motions submitted by the designated defendants for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing the representative plaintiffs' claims under Section 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a) (the "Act"). The designated defendants (hereinafter "designated defendants" or "defendants") seek summary judgment or partial summary judgment on four bases.

First, under the Act, plaintiff must allege and prove, among other things, a difference in price charged to two purchasers in contemporaneous sales in interstate commerce by a single defendant seller of commodities of like grade and quality. 15 U.S.C. § 13(a). There is a narrow exception to this principle, the "indirect purchaser" doctrine, whereby sales from a wholesaler whose pricing is controlled by a manufacturer permits a disfavored purchaser to treat the entities as one and the same. Designated defendants move the court to find that representative plaintiffs cannot show that they purchased commodities—brand name prescription drugs ("BNPDs")—from that "single seller," and furthermore that the "indirect purchaser" doctrine does not apply (hereinafter the "indirect purchaser motion").

In opposition, the representative plaintiffs argue that, at minimum, the deposition testimony raises a genuine issue of material fact whether the designated defendants set and controlled the prices that the wholesalers charged plaintiffs for the BNPDs they purchased. The representative plaintiffs assert that the only part of the sales price of BNPDs that the wholesalers controlled was the service fee, or markup, which represented the wholesalers' profit. This markup was paid both by the representative plaintiffs, and the favored purchasers, when they bought BNPDs from wholesalers.

Second, a Robinson–Patman violation requires both that favored and disfavored purchasers be in competition with each other and also that they resell products for which they received a favored price. Defendants move for summary judgment with respect to reduced price sales of BNPDs to all for-profit staff-model HMOs ("SMHMOs"), arguing that, as "insurers," they are not competitors of plaintiffs, nor do they resell BNPDs (hereinafter the "SM–HMO motion").

In opposition, plaintiffs contend that these defendants do compete for customers based upon their BNPD-plan pricing, and also assert that they fill prescriptions for nonmembers of their plans.

Third, for liability to attach under the Act, there must be at least two purchasers of a commodity, at different prices, where the two purchasers are in competition with each other. Defendants move for summary judgment with respect to all rebate agreements with legal entities that did not also take title to, resell, or dispense brand name prescription drugs (hereinafter the "non-purchaser motion").

In opposition, plaintiffs dispute the factual description of these entities, and contend that even those entities which did not take title to BNPDs did, nevertheless, exercise "dominion and control" over their distribution and therefore should be held liable.

Fourth and finally, as an element of a Robinson–Patman Act claim, plaintiffs must show that they are entitled to damages stemming from antitrust injury defined under the Clayton Act, 15 U.S.C. § 15. Defendants assert that plaintiffs have failed to make this showing. Plaintiffs oppose this assertion, presenting what they claim is evidence of antitrust injury (hereinafter "damages motion").

Having carefully reviewed the papers submitted by the parties, and as set forth below, the Court denies the designated defendants' motion for summary judgment on the representative plaintiffs' claims with respect to the "indirect purchaser" doctrine, denies the motion for summary judgment with respect to for-profit staff-model HMOs, grants in part and denies in part defendants' motion for partial summary judgment with respect to legal entities that receive rebates but do not "purchase" or take title to BNPDs, and grants the defendants' motion with respect to damages.

### PRIOR HISTORY

The background of this case has been recounted in numerous prior opinions by this Court, by the United States District Court for the Northern District of Illinois, and by the Court of Appeals for the Seventh Circuit. *See Drug Mart Pharmacy Corp. v. American Home Products Corp.*, 378 F.Supp.2d 134 (E.D.N.Y.2005); 296 F.Supp.2d 423 (E.D.N.Y.2003); 288 F.Supp.2d 325 (E.D.N.Y.2003); 2002 WL 31528625 (E.D.N.Y. Aug. 21, 2002). *See also* 288 F.3d 1028 (7th Cir.2002); 186 F.3d 781 (7th Cir.1999); 123 F.3d 599 (7th Cir.1997); 1999 WL 33889 (N.D.Ill.Jan. 19, 1999); 1996 WL 167350 (N.D.Ill. April 4, 1996); 867 F.Supp. 1338 (N.D.Ill.1994); 1994 WL 240537 (N.D.Ill. May 27, 1994). Familiarity with prior opinions is therefore assumed and only those facts necessary for a resolution of these motions are restated here.[1]

Designated plaintiffs are seventeen retail pharmacies from fourteen different

---

**1.** In addition to their claims under the Robinson–Patman Act, plaintiffs brought claims against defendants under the Sherman Act, 15 U.S.C. § 1. While this litigation was pending before Judge Charles P. Kocoras of the United States District Court for the Northern District of Illinois, the Court entered Pretrial Order Number 5, which, among other things, bifurcated discovery of the two claims and "contemplate[d] that ... plaintiffs' claims

states asserting claims against defendants, *inter alia,* under section 2(a) of the Act, 15 U.S.C. § 13(a), for giving discounts, rebates or other "charge-back" benefits (collectively "discounts") on BNPDs to health maintenance organizations ("HMOs"), managed care organizations ("MCOs"), pharmacy benefit managers ("PBMs"), and third-party payors ("TPPs") and mail order pharmacies (collectively, "favored purchasers"), while denying discounts to them.[2] *See* Defendants' Local Rule 56.1 Statement ("Defs. Rule 56.1 Statement") ¶ 1.[3] The particular facts and circumstances of these transactions are detailed with the relevant motions herein.

## INDIRECT PURCHASER MOTION

### I. BACKGROUND

Defendants Ciba–Geigy Corporation ("Ciba") and G.D. Searle & Co. ("Searle")

manufacture BNPDs. *Id.* ¶ 2. During the relevant time period, defendants did not sell BNPDs directly to independent pharmacists, including plaintiffs.[4] *Id.* ¶¶ 6, 7. Plaintiffs, as independent (non-chain) pharmacists, purchased defendants' BNPDs from wholesalers. *Id.* ¶¶ 7, 12. Plaintiffs wanted to purchase BNPDs directly from defendants because they believed it would be cheaper than purchasing BNPDs from wholesalers. *See, e.g.,* Declaration of Evan Glassman executed on February 28, 2005 ("Glassman Decl.") Aff. X 14 ¶¶ 4–6.

According to defendants, the "pricing and terms of sale by which" plaintiffs "purchased Ciba and Searle products from wholesalers were the result of arms-length transactions between" plaintiffs and "their respective wholesalers." Defs. Rule 56.1 Statement ¶ 15. Plaintiffs counter that the "prices [they] paid for BNPDs were not

---

may be tried in two separate trials." (Declaration of Robert Grass executed on January 21, 2005 Ex. 1). This Court severed the Sherman Act claims from the Robinson–Patman Act claims. In November 2004, the parties agreed to settle the Sherman Act claims shortly before trial was scheduled to commence. At that time, fifteen of the defendant manufacturers settled both plaintiffs' Sherman Act and Robinson–Patman Act claims.

Pretrial Order Number 5 stayed the Robinson–Patman Act claims asserted against all non-designated defendants until the first Robinson–Patman Act trial involving designated parties is completed. Pursuant to the pretrial order, the parties designated seventeen plaintiffs to proceed against five defendants. Two of the designated defendants—Ciba Geigy and Searle—remain, as the others have settled with plaintiffs. For the sake of simplicity, references in this opinion to "plaintiffs" and "defendants" are to the designated plaintiffs and designated defendants.

2. In addition to their section 2(a) claims, the representative plaintiffs assert claims under sections 2(d) and 2(f) of the Act. *See* 15 U.S.C. §§ 13(d), 13(f).

3. All references to 56.1 Statements and Declarations pertain to the submissions made with or in opposition to each motion.

4. It appears that plaintiffs acquired almost all of their BNPDs directly from wholesalers—a chain of distribution separate from the passage of rebate benefits. *See* Defs. Rep. 56.1 Stmt. ¶ 12. It has been noted in earlier stages of this litigation saga that between 10% and 20% of the BNPDs were obtained directly from the manufacturers. *See Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.,* No. 93–5148, 2002 WL 31528625, * 3 (E.D.N.Y. Aug. 21, 2002) (citing Def. SJ Mem. at 3). Depositions of many of the plaintiff pharmacists include testimony that on occasion they bought BNPDs directly from manufacturers, although that practice was more or less discontinued in the early to middle 1990s. *See, e.g.,* Aff X 24 (Weaver) ¶¶ 2–4; Aff. X 25 (Weiss) ¶¶ 6–8; Aff. X 20 (Tootle) ¶¶ 2–5. There is no assertion, however, that they were ever participants in a rebate program. Since the Court holds plaintiffs' indirect purchaser argument survives summary judgment, for the purposes of this motion, there is no need to determine whether plaintiffs acquired BNPDs directly from a manufacturer or indirectly via their wholesalers.

determined by wholesalers, but instead were set and determined by BNPD manufacturers," including defendants. Plaintiffs' Rule 56.1 Counter Statement of Disputed Material Facts ("Pls. Rule 56.1 Ctr. Stmt.") ¶ 15. When read in the light most favorable to them, the deposition and affidavit testimony of several plaintiffs and wholesalers reveal that the independent pharmacists always paid the "list price" for defendants' BNPDs which they purchased from the wholesalers, and it "was an accepted fact in the industry that drug manufacturers set the prices" that the wholesalers were required to charge plaintiffs upon pain of losing their relationships with the manufacturers. *See* Glassman Decl. Aff. X 20 ¶ 8; *see also id.* Aff. X 9 ¶ 8 ("It was an established fact in the industry that wholesalers could not discount below list price to retail pharmacists ... and could not do so because they did not have the authority of the drug manufacturers, no matter what volumes we were willing to buy or lengths we were willing to go in order to secure discounts."). What could be negotiated between the plaintiffs and wholesalers was a markup (the "markup") that plaintiffs paid the wholesaler and constituted the profit earned by the wholesaler for acting as an intermediary-seller. *See* Pls. Rule 56.1 Ctr Stmt. ¶ 15 (citing *e.g.,* Glassman Decl. Dep. X 18 at 97–99). When favored purchasers bought BNPDs from wholesalers, they also paid the markup which was subject to negotiation on a case-by-case basis, but it was "quite small" in comparison to the overall price paid for the BNPDs. *See* Glassman Decl. Dep. X 32 at 57–59; GX 2 at SE 000012638.

The favored purchasers were not required to pay the list prices for the BNPDs they purchased from the wholesalers as a result of, among other things, a "chargeback system" entered into between defendants and the wholesalers. That "chargeback system" was explained by

Searle in an internal memorandum as follows:

* Searle agrees on a contract pricing with the HMO and the HMO designates one or more of Searle's authorized wholesalers as the wholesaler(s) from which the HMO will buy its products.

* Searle sends the HMO notice of the contract price, but cautions the HMO that the contract price is the price which Searle will charge the HMO's designated wholesaler for products which the wholesaler re-sells to that HMO. The wholesaler is free to mark-up that price when he re-sells the products to the HMO. Generally, the amount of the wholesale mark-up is quite small.

* Searle sends the HMO's designated wholesaler notice of the contract price.

* The wholesaler notifies Searle of the quantity of each product sold to the HMO. The difference between the contract price agreed upon between Searle and the HMO and the wholesaler's normal purchase price from Searle (i.e., the wholesale acquisition cost) multiplied by the quantity purchased is the amount of the chargeback. The following is a simple calculation of a chargeback: * Wholesale Acquisition Cost (the price paid by the wholesaler to Searle): $10.00 * Contract price negotiated between Searle and HMO: $7.00 * Amount of Chargeback: $3.00.

* As you can see, without the chargeback, the wholesaler would lose $3.00 if it sold to the HMO at the contract price of $7.00. The actual price paid by the HMO will probably be slightly more than $7.00, since the wholesaler will add a small mark-up for its profit.

Glassman Decl. GX 2 at SE 000012638.

Representative testimony of the wholesalers concerning the "control" they exercised regarding the prices they charged

independent, retail pharmacists for defendants' BNPDs was as follows:

Q: We talked also earlier a little bit about sales calls and the procedure; do you recall that?

A: Yes.

Q: All right. When a—dealing first with an independent retailer.

A: Okay.

Q: Okay? Are one of the terms of the negotiations the cost factor, that is, the cost of the particular drugs that is to be paid by the retailer?

A: No.

Q: No. That's never discussed in the negotiations?

A: No.

Q: Why isn't that?

A: Because it's not very relevant. We do not—the wholesaler does not establish the price of the drug.

Q: Okay. The manufacturer does that?

A: The manufacturer does.

Q: So in other words, as with all classes of trade, Bergen sells it on what we might call a cost-plus basis?

A: That's correct.

Q: Okay. And that cost definition, is that uniform for all customers?

A: Yes.

Q: So Bergen sells it what we might call its wholesale acquisition costs plus its markup for its wholesale services, correct?

A: That's correct.

Glassman Decl. Dep. X 15 at 110–11.

The parties disagree whether the evidence proffered by plaintiffs, including that discussed above, creates a genuine issue of material fact as to plaintiffs' section 2(a) Robinson–Patman Act claims.

Defendants argue that it is undisputed that the wholesalers charged prices to purchasers of BNPDs which they set without any input from Ciba or Searle, and that the prices charged by wholesalers included both the acquisition cost of BNPDs plus the wholesalers' markup. It is the wholesalers' ability to control the markup which defendants view as outcome determinative to their motion. Plaintiffs counter by asserting that the testimony raises a genuine issue of fact whether defendants controlled the prices that the wholesalers charged them for BNPDs because it is the actual prices of BNPDs, and not the markup, which created the pricing disparity which they challenge in this case. According to plaintiffs, the undisputed fact that the wholesalers control the markup is a red-herring. The real question is whether defendants controlled the different prices paid for BNPDs by plaintiffs, on the one hand, and, the favored purchasers, on the other hand, who received substantial discounts through the chargeback system.

## II. DISCUSSION

### A. Standard Governing Defendants' Summary Judgment Motion

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." One of the principal purposes of summary judgment is to "isolate and dispose of factually unsupported claims or defenses ..." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

As an initial matter, "the moving party bears the burden of establishing the absence of any genuine issue." *Grabois v.*

*Jones,* 89 F.3d 97, 99–100 (2d Cir.1996) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *FDIC v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (holding that movant for summary judgment must bear burden of production). *See also Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001); *Higgins v. Baker,* 309 F.Supp. 635 (S.D.N.Y.1969). Without this showing a district court cannot grant summary judgment in favor of a movant, even if the adverse party has not responded. *See Anchorage Assocs. v. Virgin Islands Board of Tax Review,* 922 F.2d 168, 175 (3d Cir.1990); *Neal v. Elec. Arts, Inc.,* 374 F.Supp.2d 574, 578 (W.D.Mich.2005); 10B Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Procedure and Practice,* 395 (1998) (citing "Notes of Advisory Committee on Rules," 28 U.S.C.A. Rule 56 (1960), as amended (Supp.) (without at least pointing to the basis for granting summary judgment, the Court cannot grant the motion despite the lack of opposing evidentiary matter)). While this showing need not require the movant to introduce evidence negating the opponent's claim, it must "point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

Once the prima facie case for the absence of a genuine issue of material fact has been presented, the nonmoving party must produce evidence to counter all of the movant's showings. A genuine issue as to a material fact exists when there is sufficient evidence favoring the nonmoving party such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, the nonmoving party "may not rest upon the mere allegations or denials" of its pleadings; rather, its response must go beyond the pleadings to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

When evaluating a motion for summary judgment, "[t]he courts must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.,* 138 F.3d 81, 87 (2d Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). If there remains no genuine issue of material fact then the moving party is entitled to judgment as a matter of law.

**B. The Indirect Purchaser Claim Under Section 2(a) of the Act**

Section 2(a) of the Act is designed to protect purchasers from a single seller who establishes a discriminatory pricing policy.[5] A plaintiff must allege and prove that the defendant made two sales of the same commodity to at least two different purchasers at different prices. *See*

---

**5.** Section 2(a) states in relevant part as follows: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. . . . " 15 U.S.C. § 13(a).

*Fed. Trade Comm'n v. Morton Salt Co.,* 334 U.S. 37, 45, 68 S.Ct. 822, 92 L.Ed. 1196 (1948); *see also Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578, 584 (2d Cir.1987) (price discrimination means nothing more than a price differential). In this case, plaintiffs concede that they purchased BNPDs not from defendants, but rather from wholesalers, who have a corporate structure independent from defendants. Plaintiffs argue, nonetheless, that they make out a claim under the Act based on the "indirect purchaser" doctrine, which states that a manufacturer, by utilizing a wholesaler which it controls, cannot evade the price discrimination provisions of the Act. *See, e.g., Am. News Co. v. Fed. Trade Comm'n,* 300 F.2d 104, 109 (2d Cir.1962), cert. *denied,* 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962) ("under § 2(a) ... there need not be privity of contract between seller and an ultimate buyer to establish the buyer as a ... 'purchaser.' If the manufacturer deals with a retailer through the intermediary of wholesalers, dealers, or jobbers, the retailer may nevertheless be a ... 'purchaser' of the manufacturer if the latter deals directly with the retailers and controls the terms upon which he buys"). Stated differently, one who purchases a manufacturer's goods through a wholesaler may be deemed to have purchased directly from the manufacturer if the manufacturer deals directly with the wholesaler and controls the terms under which the purchaser buys. *See Baim & Blank v. Philco Corp.,* 148 F.Supp. 541, 543 (E.D.N.Y.1957) (citation omitted). The critical element in determining whether the indirect purchaser doctrine applies is the degree of control the manufacturer exercises over its intermediate buyer, in this case, the wholesaler. *See FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019, 1028 (2d Cir. 1976), cert. *denied,* 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); *see also Bar-*

*nosky Oils, Inc. v. Union Oil Co. of California,* 665 F.2d 74, 84 (6th Cir.1981); *Purolator Prods., Inc. v. Fed. Trade Comm'n,* 352 F.2d 874, 881 (7th Cir.1965), cert. *denied,* 389 U.S. 1045, 88 S.Ct. 758, 19 L.Ed.2d 837 (1968) (upholding FTC's finding that manufacturer engaged in price discrimination through its distribution system); *see generally Lefrak v. Arabian Am. Oil Co.,* 487 F.Supp. 808, 818 (E.D.N.Y. 1980) ("The facts before the court clearly indicate that [plaintiff] is not entitled to invoke th[e indirect purchaser] exception. The distributors acted independent of their suppliers, and made contract and pricing decisions according to their individual concerns. This lack of ownership or control is amply supported by the exhibits presented to the court.").

■ The evidence viewed in the light most favorable to plaintiffs reveals that the defendant manufacturers charged the wholesalers significantly less for BNPDs which they sold to favored purchasers than they did for BNPDs which the wholesalers sold to plaintiffs as a result of the chargeback system. Moreover, defendants exerted economic pressure to ensure that those pricing disparities were passed on to both favored purchasers and plaintiffs. Although the wholesalers were free to negotiate the markup directly with the purchaser, plaintiffs assert that because the markup was such an insignificant component of the total purchase price of the BNPDs (acknowledged by Searle in its own internal memorandum cited above), defendants engaged in price discrimination when they demanded a lower net sales price from the wholesalers for BNPDs sold to the favored purchasers than those sold to plaintiffs.

In *Susser v. Carvel Corp.,* 332 F.2d 505 (2d Cir.1964), cert. *dismissed,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965), the Second Circuit held that an ice cream

manufacturer's practice of recommending a retail price to its franchised dealers was lawful where "the franchise provisions explicitly reserved to the individual dealer the right to set whatever price he desired" and where no attempts to enforce the price structure were shown. *Id.* at 510. The suggested price sheets were, therefore, provided as a convenience to the dealers and were a "floor," that is, provided a suggested minimum price level that the dealers could, but did not have to, use in setting price. *See id. See also FLM Collision Parts,* 543 F.2d at 1028 (affirming FTC's finding of a violation of the Act but noting that if the court applies the "indirect purchaser" doctrine merely because a manufacturer suggests a price that a dealer or wholesaler could charge a customer, this "would reach the absurd result of extending the [indirect purchaser] doctrine to every resale of goods"); *but see Kraft–Phenix Cheese Corp.,* 25 F.T.C. 537, 546 (1937) (order dismissed complaint on other grounds but explained that retailers buying from wholesalers are considered to be "purchasers" from the manufacturer where the manufacturer promotes sales directly to the retailers and the manufacturer exerts effective control through dissemination of price lists over the prices charged by wholesalers).

In contrast to the facts in *Susser,* here, plaintiffs have come forward with admissible evidence that defendants controlled the price of BNPDs which the wholesalers charged plaintiffs. In short, the evidence viewed in the light most favorable to plaintiffs reveals that defendants required plaintiffs to purchase BNPDs through wholesalers, the wholesalers were not free to set their prices, and defendants coerced them to sell BNPDs to plaintiffs at a higher price than they sold BNPDs to favored purchasers. Because of the chargeback

system, this is not a case where defendants sold BNPDs to wholesalers at the same price regardless of the type of customer (independent pharmacist or favored purchaser) who bought BNPDs from the wholesalers.

Similarly, defendants' reliance on *FLM Collision Parts* is peculiarly inapposite because there the manufacturer "did not attempt through the medium of a suggested price or otherwise to set the prices at which its dealers would sell crash parts to FLM." 543 F.2d at 1028. The facts presented by plaintiffs reveal that defendants have done what the Second Circuit in *FLM Collision Parts* intimated they could not do. Defendants did not set a floor below which the wholesalers could not sell BNPDs to either plaintiffs or favored purchasers. Rather, they set up an unequal pricing mechanism which would, at minimum, lead to plaintiffs paying more for BNPDs than the favored purchasers.

For the foregoing reasons, defendants' motion for summary judgment based upon alleged indirect purchases is denied.

### *SM–HMO MOTION*

## I. INTRODUCTION

Pending before the Court is a motion for partial summary judgment submitted by the designated defendants relating to all the representative plaintiffs' claims under the Robinson–Patman Act, 15 U.S.C. § 13(a) (the "Act"), as to all discounts on rebates to for-profit staff-model health maintenance organizations. Based upon the following analysis, that motion is denied.

## II. BACKGROUND

The current motion examines the validity of §§ 2(a) and 2(d) [6] claims with respect

---

**6.** The defendants' complaint primarily addresses the section 2(a) claims, although they

to sales of BNPDs to for-profit HMOs.[7] At issue here is whether or not for-profit staff model health maintenance organizations (hereinafter "SM–HMOs") are in competition with retail pharmacies for the sale of BNPDs, giving rise to a violation of the Robinson–Patman Act, 15 U.S.C. §§ 13(a) and (d). The organization and manner of operation of HMOs is defined by law. *See* 42 U.S.C. §§ 300e(a) & (b). The statute states that members of an HMO are to be provided "basic health services for a basic health services payment" which is "(A) . . . paid on a periodic basis without regard to the dates health services (within basic health services) are provided; and (B) is fixed without regard to frequency, extent, or kind of health service (within the basic health services) actually furnished." *Id.* *See also* Local Rule 56.1 Reply Statement, ("Pls. 56.1 Rep. Stmt.") ¶ 6.

SM–HMOs, like many HMOs, are health care organizations that provide members with an array of health services.[8] *See* Mincy Aff. ¶ 50. Unlike other types of HMOs, staff-model HMOs offer services provided by salaried employees of the SMHMO itself, as opposed to arrangements with independent providers. *See id.*

¶ 56; Declaration of Jennifer M. Driscoll in Support of Designated Defendants' Motion for Partial Summary Judgment, ("Driscoll Decl.") Ex. B–1, Expert Report of Alain C. Enthoven, ("Enthoven Rep.") ¶ 10. Sometimes these services include BNPD-benefit programs. *See id.* ¶ 11. In return, the SM–HMO collects a fixed-fee for covered services. *See* Enthoven Rep. ¶¶ 37–40; Mincy Aff. ¶ 50. Often, in addition to paying fixed fees, the consumers which subscribe to these services ("subscribers") will also make a co-payment for goods or services actually rendered. *See* Mincy Aff. ¶¶ 64, 67; Enthoven Rep. ¶ 40. The use of a deductible by an HMO is authorized by law. *See* 42 U.S.C. § 300e(b)(1)(D).

Fundamentally, this transaction involves the shifting of risk. Alongside the fixed-fees they receive, SM–HMOs accept the risk that subscribers will consume more health care and/or BNPDs than their payments would otherwise cover. *See* Enthoven Rep. ¶ 37. Of course, this is not necessarily a losing proposition for the SM–HMOs, because they may also keep any excess fees that are not used to cover a subscribers' health care costs. *See id.* In

---

also argue against 2(d). *See* Def. Mem. Law 13. Section 2(d) makes it unlawful:

> [F]or any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any service or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all customers competing in the distribution of such products or commodities.

15 U.S.C. § 13(d).

Defendants contend that their argument that there is no competition means there is no violation of 2(d) either. Since the basis for

their challenge is the same, this discussion applies with equal force to both the 2(a) and 2(d) claims.

**7.** Section 2(f) claims were also filed against defendants Caremark, Medco, and Thrift Drug d/b/a Express Pharmacy Services, defendants who owned mail-order pharmacies and are not currently before the Court.

**8.** Although plaintiffs superficially dispute the relevance of many of defendants' Rule 56.1 statements of fact, *see, e.g.,* Pls. 56.1 Rep. Stmt. ¶¶ 4, 6, 13, these arguments are undercut by the plaintiffs' own expert witness, whose description of SM–HMOs accords with that proposed by defendants. *See* Mincy Aff. ¶¶ 50–61. In this regard, the facial dispute over the basic structure of SM–HMOs presented by the 56.1 statements appears semantic rather than substantive.

return, subscribers protect against the risk of high medical care costs in the event they succumb to a covered medical condition. Subscribers reduce variance in health care costs to a fixed-fee, and for accepting this risk, SM–HMOs charge fees that cover the actuary-determined risk and some profit. As a result of this arrangement, SMHMOs are given an incentive to control the cost of health care, including the costs of BNPDs. *See* Driscoll Decl., Ex. B–1 ¶¶ 34, 37; Mincy Aff. ¶ 68.

In their briefing papers, the parties offer conflicting descriptions of the operation of several HMOs at issue here. Given the dynamic on-going transformations in the health care industry occurring before, during, and after the relevant time period in this case, it is not surprising that the parties' descriptions of HMOs vary in some respects. Not all of these differences, however, are material. As best can be discerned, the defendants' motion is directed at agreements with those SM–HMOs that share a certain set of attributes, enumerated below. Where plaintiffs have asserted factual differences, those differences will be noted. The Court understands that the defendants' motion is addressed to those SM–HMOs as described above that 1) offer fixed-fee health care services which 2) provide BNPD-benefit programs that 3) actually dispense BNPDs to subscribers, and subscribers only.[9] The Court does not apply its conclusions to the variety of other HMO typologies described in the record, including those SM–HMOs that do not operate in-house pharmacies. It also does not consider the relevance of this discussion to IPA-model, group model, or network model HMOs.

Given the aforementioned characterization of SM–HMOs, defendants make three independent arguments to justify partial summary judgment. First, they assert that SMHMOs are sufficiently like insurance companies because of their risk-spreading function. As such, they contend that SM–HMOs are "end-user purchasers" under the *Kartell* line of cases. *See Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922 (1st Cir.1984), *cert. denied*, 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985); Defs. Mot. 4. As end-users, they argue, they cannot also be considered competitors of retailers, a necessary element of a Robinson–Patman violation.

Second, following the logic of *Sano Petroleum Corp. v. American Oil Co.*, 187 F.Supp. 345 (E.D.N.Y.1960), they contend that SM–HMOs and retail pharmacies are not in competition with each other because the BNPDs purchased by SM–HMOs are merely one input in the overall health care package that SM–HMOs provide their subscribers. Since they compete with other comprehensive health services organizations, they argue, they do not compete with retailers, so the discounts cannot have harmed retail competition.

Third, they assert that even if as a matter of law SM–HMOs could be considered competitors of retail pharmacies, plaintiffs have produced no evidence that they compete with SM–HMOs.[10]

---

9. The parties do not agree on who would be a "subscriber" under the Act. Plaintiffs appear to argue that subscribers include only those individuals who are members of a particular SM–HMO, and do not include the insureds of third-party payors which have contracted with the SM–HMO for pharmacy benefits. *See* Pls. Mem. 7–9. Defendants appear to group the above categories together. *See* Defs. Rep. 10.

10. Defendants introduce evidence to substantiate their assertion that there is no genuine issue of material fact. They admit that SM–HMOs purchase BNPDs, but produce evidence in the form of contracts with manufacturers promising that the BNPDs will only be

Plaintiffs generally accept the above characterization of SM–HMOs–one of their proposed experts, David Mincy, avers that he would testify similarly at trial. However, plaintiffs argue in opposition that, as a matter of fact, competition between SM–HMOs and retail pharmacies occurs for subscribers, third-party payor members and cash-paying customers. Plaintiffs dispute the treatment of these agreements as purely insurance contracts because benefit plans are sold separately from health insurance plans, and BNPDs are sometimes sold to non-subscribers.[11]

Arguing against defendants' assertion of end-user treatment for insurers, plaintiffs contend that the case law here is inapplicable because it deals exclusively with Sherman Act cases. *See* Defs. Mot. 15–16. Plaintiffs also contend that co-payments constitute a "resale" of the product, and therefore SM–HMOs are resellers, not end-users. They further assert that these resales are to plaintiffs' actual and potential customers, placing them in competition with SM–HMOs. Even if the Court were to consider the sales here under *Kartell* as direct sales to subscribers, they argue that sales to non-subscribers would push the present case outside of *Kartell's* orbit, since the SMHMOs would in effect be reselling to non-insureds.

Plaintiffs also dispute the analogy to *Sano Petroleum* for many of the same reasons they dispute *Kartell's* applicability.

They distinguish *Sano Petroleum* by asserting that the question of competition is generally a factual matter, and their evidence shows that there is some competition.

## III. DISCUSSION

### A. Claims Under the Robinson–Patman Act, 15 U.S.C. § 13

#### 1. Secondary Line Injury

 Secondary line injury, which plaintiffs claim to have suffered, results from price discrimination between favored and disfavored purchasers. *See Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 558, n. 15, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990); *see also Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 219 (2d Cir.2004) ("a secondary-line violation occurs where the discriminating seller's price discrimination injures competition among his customers"). To make out a *prima facie* case for a § 2(a) secondary-line price discrimination violation,[12] the plaintiff must show: "(1) that seller's sales were made in interstate commerce; (2) that the seller discriminated in price as between the two purchasers; (3) that the product or commodity sold to the competing purchasers was of the same grade and quality; and (4) that the price discrimination had a prohibited effect on competition." *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 141 (2d Cir.1998) (citing *Hasbrouck*,

dispensed to members of the plan. *See, e.g.,* Driscoll Decl., "Mattox Dep." Ex. 9 (Contract between Ciba and Cigna) Tab A–2, CG00000790.

**11.** With respect to the defendant Searle only, plaintiffs contend that its agreements with SMHMOs provide no limit on the purchasers' resale rights, thus permitting them to resell BNPDs, regardless of the subscriber status of the end user. Because the Court denies the motion with respect to both defendants on

other grounds, it does not consider the significance of this assertion.

**12.** The consolidated complaints against which the defendants now move assert claims under §§ 2(a) and 2(d) of the Robinson–Patman Act as amended, 15 U.S.C. § 13. In this motion, the parties focus on the § 2(a) claims. Since the structural elements of a § 2(d) claim are essentially the same as those under § 2(a), the Court's discussion will apply with equal force to both.

496 U.S. at 556, 110 S.Ct. 2535). Damages are not a part of the *prima facie* case.[13]

### 2. "In Competition"

■ "In order to establish the requisite competitive injury in a secondary-line case, plaintiff must first prove that, as the disfavored purchaser, it was engaged in actual competition with the favored purchaser(s) as of the time of the price differential." Best *Brands Beverage,* 842 F.2d at 584 (citing *Lupia v. Stella D'Oro Biscuit Co.,* 586 F.2d 1163, 1170 (7th Cir.1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979)); *Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 421 F.Supp. 237, 245 (D.N.J.1976). *See generally,* F. Rowe, *Price Discrimination Under the Robinson–Patman Act* 173–180 (1962) (explaining that a "competitive nexus between the customers receiving the higher and the lower prices is a basic predicate of any conclusion of adverse effects at the customer level attributable to a seller's price differentials.").

■ The plaintiff must also show that the probable effect of the price discrimination would be to allow the favored purchaser to draw sales and profits from the disfavored purchaser. *See J. Truett Payne Co., Inc. v. Chrysler Motors Corp.,* 451 U.S. 557, 569–70, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981) (Powell J., dissenting in part) (citing *Enter. Indus., Inc. v. Texas Co.,* 240 F.2d 457, 458 (2d Cir.1957), *cert. denied,* 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957)).

■ Competition between the favored and disfavored purchasers must occur at the same functional level. *See Best Brands Beverage, Inc.,* 842 F.2d at 585. In other words, as competitors, they must be "... all wholesalers or all retailers, and within the same geographic market." *Id.* The Second Circuit has held that "[d]etermining the presence or absence of functional competition between purchasers of a commodity is simply a factual process which focuses on whether these purchasers were directly competing for resales among the same group of customers." *Haug,* 148 F.3d at 141–42; (citing *Fed. Trade Comm'n v. Fred Meyer, Inc.,* 390 U.S. 341, 349, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968)).

■ Since both favored and disfavored purchasers must be competing for customers, the Act is applicable only when the purchasers are also resellers. *See, e.g., Lycon Inc. v. Juenke, et al.,* 250 F.3d 285, 289 (5th Cir.2001), cert. *denied, Lycon, Inc. v. EVI Oil Tools, Inc.,* 534 U.S. 892, 122 S.Ct. 209, 151 L.Ed.2d 148 (2001). Normally, direct sales to end-users are not considered sales "in competition." *See, e.g., S. Bus. Commc'ns v. Matsushita Elec. Corp. of Am.,* 806 F.Supp. 950, 960 (N.D.Ga.1992) (County which purchased for its own use could not be a purchaser under § 2(a) because it did not compete with plaintiff for resales). For the purchasers of the products to be in competition with each other, they must pass the product on in some form. Generally, a consumer and a retailer cannot compete. *See* 3 Kintner and Bauer, *Federal Antitrust Law* 299 (1983) ("... the Act is implicated only when customers pay different prices for goods which they will resell, either in the same ... form as purchased, or as a raw ingredient or input into another product. If the two customers are consumers of the product, they are not 'competitors ...' "); *see also* Herbert Hovenkamp, 14 Antitrust Law: An

---

**13.** Discussion of the damages element of the claim is reserved for the Court's analysis of the damages motion.

Analysis of Antitrust Principles and Their Application, 89–95 (1999).

█ It thus follows that if a distributor loses customers to a manufacturer's cheaper direct prices, the Robinson–Patman Act will not offer a remedy. The exceptions prove the rule; when "end-users" begin to resell, or wholesalers begin to compete as resellers, courts have looked through the formal description of economic function to the economic reality of the situation, and found that competition exists. *See generally, Hasbrouck,* 496 U.S. 543, 110 S.Ct. 2535, 110 L.Ed.2d 492; *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft,* 19 F.3d 745 (1st Cir.1994). With these principles in mind, the Court turns to defendants' motion.

### B. Defendants' Arguments

### 1. Insurers as End–User Purchasers: Is *Kartell* Applicable?

Defendants argue that SM–HMOs purchase BNPDs on behalf of their subscribers, and dispense them as part of a fixed-fee service. They urge the Court to view them as insurers and/ or as procuring agents acting on behalf of subscribers. This treatment would entitle them to summary judgment, they reason, because discounts to end-users (or agents acting on their behalf) are not discounts to "competing purchasers." Defendants derive this treatment of SM–HMOs as "end-users" from the *Kartell* line of cases. *See* 749 F.2d 922.

Under this theory, the insurer is considered a purchaser on behalf of end-users. For purposes of either granting the insurers standing to sue for antitrust injury, or providing them with a defense against antitrust conspiracy and price-fixing suits, courts have found that insurers are single "buyers" or "purchasers" for antitrust purposes. *See, e.g., Kartell,* 749 F.2d at 926 (arguing that "[t]he relevant antitrust facts are that Blue Shield pays the bill and seeks to set the amount of the charge. Those facts ... convince us that Blue Shield's activities here are like those of a buyer."); *Med. Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.,* 675 F.2d 502, 505 (2d Cir.1982) (holding that the imposition of price terms on local pharmacies by insurers was subject to the rule of reason, and upholding district court's finding that "Blue Cross was the purchaser of the prescribed drugs"); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic,* 881 F.Supp. 1309 (W.D.Wis.1994) (finding that "[f]or antitrust purposes, Blue Cross is treated as a buyer where it pays the bill and seeks to set the amount charged") (citing *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 216–17, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979)); *Brillhart v. Mut. Med. Ins. Inc.,* 768 F.2d 196, 199 (7th Cir.1985); *Michigan State Podiatry Ass'n v. Blue Cross and Blue Shield of Michigan,* 671 F.Supp. 1139, 1152 (E.D.Mich.1987); (additional citations omitted); *Feldman v. Health Care Serv. Corp.,* 562 F.Supp. 941 (N.D.Ill.1982) ("Each federal court which has examined the question in the context of the antitrust laws has decided that an insurer paying out pursuant to its policy of insurance is actually a purchaser of goods or services, and that the insured is merely the recipient of the goods or services pursuant to the policy."). In short, a chorus of judicial opinion has proclaimed that when insurers purchase health services and pharmaceuticals for the benefit of their members, they are treated like *purchasers* under the antitrust laws.[14] *See Kartell,* 749 F.2d at 926

---

14. The simile relationship is important because courts appear hesitant to employ this second-order use of "buyer" in blanket fashion across all of antitrust law. In *Kartell,* for

("The same facts convince us that Blue Shield's activities here are *like* those of a buyer.") (emphasis added). In a sense, these courts have viewed the insurer's role as akin to that of a broker. *Id.* at 925 ("... from a commercial perspective, Blue Shield in essence 'buys' medical services for the account of others ...").

Defendants seek their treatment as end-user purchasers, placing them out of competition with plaintiffs, since direct sales to end-users, even at favorable prices, cannot be construed as sales to competitors. *See S. Bus. Commc'ns,* 806 F.Supp. at 960.

The rationale behind these decisions is that insurers have incentives to control costs in order to compete on price with other insurance companies, and that such competition produces lower prices inuring to the benefit of consumers. *See Blue Cross & Blue Shield of Wisconsin,* 881 F.Supp. at 1317, 1319. In the Sherman Act context, policy considerations favoring pro-competitive arrangements have encouraged courts to apply the "rule of reason" analysis to these agreements, *see Feldman,* 562 F.Supp. at 951, since "the antitrust laws are not intended to protect profit margins but consumer welfare." *Id.* at 950 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)).

Despite this voluminous list of Sherman Act cases, this Court has to yet to find—and the parties have yet to provide—a single related case applying this doctrine to a claim under the Robinson–Patman Act. Defendants ambitiously overstate the law's incorporation of Sherman Act doctrine in the Robinson–Patman context. Nevertheless, the proposition merits discussion, albeit as a novel application of antitrust law. Having considered the question, the Court finds it injudicious to

apply *Kartell* analysis to the present case and thus declines to so do.

The Robinson–Patman and Sherman Acts deal with distinct aspects of competition law. The Sherman Act looks to curb certain forms of illegal monopolies and conspiracies while the Robinson–Patman Act looks to protect smaller competitors by giving them the same access to discounts that would otherwise be reserved for those commanding more buying power. *See, e.g., Fred Meyer,* 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222; *Fed. Trade Comm'n v. Henry Broch & Co.,* 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960); *Innomed Labs, LLC v. Alza Corp.,* No. 01–8095, 2002 WL 31521084 (S.D.N.Y. Nov. 13, 2002), aff'd, 98 Fed.Appx. 51 (2d Cir. 2004). It has frequently been noted by commentators that there is a tension between the objectives of the Robinson–Patman and Sherman Acts. *See, e.g.,* 14 Hovenkamp, *supra,* 118–125. Although the Supreme Court has said that the conflict between the two acts should be minimized as much as possible, *see Great Atl. & Pac. Tea Co., Inc. v. Fed. Trade Comm'n,* 440 U.S. 69, 80–3, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979), the case law does not require the two statutes to operate in perfect harmony. *See id.* (citing *Standard Oil Co. v. Fed. Trade Comm'n,* 340 U.S. 231, 249, 71 S.Ct. 240, 95 L.Ed. 239 (1951)).

Were the Court to import Sherman Act doctrine wholesale, it would produce a previously nonexistent statutory safe-harbor for the health care industry. Defendants have failed to explain or justify such a radical transformation of the Act which, when read in its entirety, excludes by enumeration such a safe-harbor. More specifically, they have failed to explain why the pro-competitive rationale used to justify

example, the Court explicitly limited the finding that Blue Shield was a buyer under the

antitrust laws to the application before it. *See Kartell,* 749 F.2d at 926.

"rule of reason" treatment under the Sherman Act should also be applicable to price discrimination claims under Robinson–Patman, where the pro-competitive effects of price discrimination are irrelevant, unless they ground one of the enumerated defenses. *See* 15 U.S.C. § 13(a).

The fact that none of the courts which have treated purchasers as insurers contemplated liability under Robinson–Patman militates against its application as a matter of law. Those cases considered conspiracy, group buying and tying claims. This case deals with price discrimination between competitors. Defendants' proposed use of *Kartell* would employ Sherman Act protections for "buyers" of goods that would not otherwise be given under a Robinson–Patman analysis of whether the parties are in actual, functional competition. *See Haug*, 148 F.3d at 141–42.

Moreover, neither the cited cases nor the elements of claims under these statutes are similar enough to justify this blanket cross-application. The "competing purchaser" element of the Robinson–Patman claim to which defendants wish to apply their theory doesn't exist as an element of the Sherman Act claims under which *Kartell*, its siblings and progeny were decided. In addition, the language of the *Kartell* line of cases indicates that those courts limited their holdings to the facts before them. *See, e.g., Kartell*, 749 F.2d at 926. Were the question whether or not to apply analysis of a claim element shared by both acts, the cross-application might make sense. Here, however, it does not.

Furthermore, the defendants' argument would, in effect, confer exemptions upon for-profit insurers that are explicitly rejected by the Nonprofit Institutions Act ("NIA"). Under the NIA, nonprofit organizations can accept discounts for goods purchased for their "own-use." *See* 15 U.S.C. § 13c. The Ninth Circuit has held that it covers nonprofit HMOs that dispense drugs to their patients. *See De Modena v. Kaiser Found. Health Plan, Inc.*, 743 F.2d 1388 (9th Cir.1984), cert. denied, 469 U.S. 1229, 105 S.Ct. 1230, 84 L.Ed.2d 368 (1985). The "own-use" aspect of the NIA has been enforced. The Supreme Court, for example, has found that local governments are not shielded by the NIA when they resell drugs bought at favorable prices for profit. *See Jefferson County Pharm. Assoc., Inc. v. Abbott Lab.*, 460 U.S. 150, 103 S.Ct. 1011, 74 L.Ed.2d 882 (1983). Defendants' application of *Kartell* would permit even for-profit insurance companies to buy goods at discounts without regard to competition—despite the clear language of the statute limiting the benefit to "non-profits."

Second, applying *Kartell* would muddle the jurisprudence on the "business of insurance" exception under the McCarran–Ferguson Act. *See* 15 U.S.C. §§ 1012(b), 1013(b). The applicability of McCarran–Ferguson exemption for agreements under the "business of insurance" is not before the Court, so no determination with respect to its applicability is made here.[15] However, if the Court were to read the present cases through *Kartell*, it would conflate Sherman Act doctrine with the more appropriate discussion under McCarran–Ferguson. At the very least, the exemption would parallel that explicitly cre-

---

**15.** The parties cite to cases in this area, but no claim under the Act is made under this motion. *See, e.g., Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 232, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979); *Klamath–* *Lake Pharm. Assoc. v. Klamath Med. Serv. Bureau*, 701 F.2d 1276 (9th Cir.1983), cert. denied, 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983).

ated by Congress. The Court declines to facilitate this confusion.

### 2. BNPDs as Inputs: Is *Sano Petroleum* Applicable?

Defendants' second argument relies upon *Sano Petroleum*, 187 F.Supp. 345 (E.D.N.Y.1960). In that case, defendant American Oil was a seller of gasoline to a variety of distributors [16] including plaintiffs and Metropolitan, a company which leased trucks and provided gas for them. Metropolitan used the gas exclusively to refuel its fleet of rental trucks. *See Sano Petroleum*, 187 F.Supp. at 350. Because Metropolitan acquired gas at a discounted price, the gas stations brought a 2(a) price discrimination claim against the seller. The court found that a truck leasing company which bought gas at a discount for the exclusive use of its fleet was not in competition with local gas retailers, and therefore found there to be no "favored purchaser." The basis for its decision was that the two were not in competition: "it was Metropolitan rental arrangement, rather than the price discrimination afforded Metropolitan by American, that foreclosed the market." *Id.* at 357.

Defendants assert that *Sano Petroleum* is apposite here. They contend, in essence, that both the bundling of health care services with BNPDs and the insurance element of BNPD benefit plans use BNPDs as a mere "input" in the package sold. Despite their concession that *Haug*, a case controlling the Court's decision of this issue, focuses the inquiry on the question of actual competition, defendants argue that the specific determinations in *Sano Petroleum* foreclose the inquiry.

*Sano Petroleum* carries some weight as an analogue to the present case. *Yet Sano*

*Petroleum*'s finding does not relieve the Court of the obligation to review the record in a light most favorable to plaintiffs to see if they have proffered any evidence of "actual competition" as mandated by *Haug*. That case dealt with a price discrimination claim where the plaintiff was an auto parts dealer and the alleged favored purchaser was a parts and service dealer that also sold cars. The Second Circuit found that the allegations of competition in the pleadings were sufficient to survive a motion to dismiss. *See Haug*, 148 F.3d at 141–42. That court reasoned that the "presence or absence of functional competition between purchasers of a commodity is simply a factual process which focuses on whether these purchasers were directly competing for resales among the same group of customers." *Id.* The court in *Haug* also noted that even if they were not on the same functional level, evidence could show competition. *See id.* at 142.

This Court is compelled to follow *Haug*. To the extent that *Sano Petroleum* implies that, as a matter of law, goods sold in conjunction with other agreements do not compete with similar goods sold separately, *Haug* overrules it, since *Haug* treats the question of competition as a factual inquiry. Indeed, in *Sano Petroleum* the judge found, as a matter of fact, that there was no competition between plaintiff and favored purchasers. *See Sano Petroleum*, 187 F.Supp. at 347, 357. As long as plaintiffs make a showing that they functionally compete with SM–HMOs, they can survive summary judgment.

### C. Evidence of Competition

██ To establish actual competition, plaintiffs need only show "competitive con-

---

**16.** Two other purchasers of gasoline, Swift and Uneeda, were also discussed in the opinion, but defendants' argument is largely based on the analogy to Metropolitan. *See* Def. Mem. 9–11.

tact," that the favored and disfavored purchasers competed on the same functional level and in the same geographic market. *See Best Brands Beverage,* 842 F.2d at 584–85. *See also Godfrey v. Pulitzer Publ'g Co.,* 276 F.3d 405, 409–10 (8th Cir. 2002). Plaintiffs have proffered evidence of competition sufficient to survive summary judgment.

Plaintiffs proffered evidence that a trier of fact could believe, including official reports from Ciba–Geigy indicating that the biggest threat to retail pharmacies comes from the development of HMO in-house pharmaceutical sales. *See* Ex. MX 51, CGOO257794–816, at CGoo257803, CGoo257806. Seen in its best light, the evidence creates a factual dispute regarding SM–HMO competition with retail pharmacies, whether those customers be subscribers or non-subscribers.[17]

Plaintiffs also proffer evidence that sales of BNPDs have been made by SMHMOs to "walk-in"[18] customers. Plaintiffs contend that retail pharmacies compete with SM–HMOs for sales to both cash-paying customers and members of other third-party plans. They assert that

several SM–HMOs have admitted that although they do not seek-out fee-for-service customers, they would sell them pharmaceuticals. *See* Ramirez Dep. X28 (Kelsey–Seybold), 224:15–225:22; Reitz Dep. X30 (Columbia Health Plan), 30:10–31:26; Greenwald Dep. X16 (Group Health Plan), 20:1–21. While the evidence does not clearly point to actual competition for cash paying customers, seen in a light most favorable to plaintiffs, it could support the SM–HMO understanding that they competed with retail pharmacies.[19]

Defendants assert that the above testimony was, at most, speculation by the deponents. *See* Defs. 56.1 Rep. Stmt. ¶ 41. But a trier of fact could reasonably read the above and other statements as acknowledgments that a consumer not otherwise a member of a company's BNPD benefit program had the opportunity, and the choice, of buying through an SM–HMO's in-house pharmacy or at a retail pharmacy. This would place the pharmacies in competition. At any rate, "the Supreme Court has repeatedly held that section 2(a) does not 'require that the dis-

---

**17.** The Court does not examine the question of liability exemptions for subscribers under any theory other than those proposed here, which it rejects.

**18.** By "walk-in" customers, plaintiffs mean "both cash-paying and members of other insurance plans." Pls. Mem. 3. By "cash-paying" customers, plaintiffs appear to refer to those customers who are neither members of the SM–HMO from which they acquire the drugs nor subscribers to a third-party payor plan. By members of other insurance companies, plaintiffs appear to be referring to individuals that have insurance from elsewhere which may or may not include a prescription benefit program run through the SM–HMO, but nevertheless acquire drugs through the HMO.

**19.** Q: (By Mr. Armstrong) would any of— would you compete for the filling of the pre-

scription of a Sanus member with another retail pharmacy?

A: Yes.

Q: Would you compete with another retail pharmacy for the filling of an Aetna member? A: Yes.

Q: Would you compete with another retail pharmacy for the filling of a Blue Cross Blue Shield member?

A: Yes.

Q: Would your testimony be the same for all the other third-party groups?

A: Yes.

Q: Can a Sanus member who has elected to have medical benefits provided by a physician outside the Kelsey–Seybold network have his prescription filled from a Kelsey–Seybold clinic?

A: Yes.

Glassman Decl., Dep. X 28 (Ramirez Dep.) 249:24–250:19.

criminations must in fact have harmed competition, but only that there is a reasonable possibility that they 'may' have such an effect.' " *Godfrey,* 276 F.3d at 410 (citing *Corn Prods. Ref. Co. v. Fed. Trade Comm'n,* 324 U.S. 726, 742, 65 S.Ct. 961, 89 L.Ed. 1320 (1945); *Falls City Indus., Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 434–35, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983); *J. Truett Payne,* 451 U.S. at 561–62, 101 S.Ct. 1923; *Morton Salt,* 334 U.S. at 46, 68 S.Ct. 822). Defendants' motion with respect to SM–HMOs is therefore denied.

## CONCLUSION

■ Because defendants' motion is to categorically exclude from Robinson–Patman liability those agreements with SM–HMOs that purchase BNPDs and dispense them through their in-house pharmacies and plaintiffs have raised an issue of fact with respect to at least some of them, the motion is denied.

## NON–PURCHASER REBATES MOTION

The Court next considers defendants' motion for partial summary judgment relating to all the representative plaintiffs' claims under the Robinson–Patman Act, 15 U.S.C. § 13(a) (the "Act"), as to all legal entities which received rebates that do not take title to, resell, or dispense brand name prescription drugs. Having carefully reviewed the papers submitted by the parties, and as set forth below, the Court grants defendants' motion for summary judgment in part and denies it in part.

## I. BACKGROUND

### A. Current Dispute

At issue here are agreements that defendant-manufacturers have made with PBMs and TPPs,[20] which manage the drug benefit portion of many healthcare enterprises. Defendants argue that there is no title transfer of BNPDs to PBMs. At most, they conceive of PBMs as purchasing agents for large healthcare and insurance providers and consumers. In moving for partial summary judgment, defendants make two arguments: (1) that the relevant PBMs did not "purchase" the drugs because the rebate agreements did not constitute "sales," and (2) that no competitive injury resulted from the transactions.

In opposition, plaintiffs contend that the agreements between PBMs and manufacturers are, in fact, discounted sales to the PBM. Additionally, plaintiffs ascribe some PBMs to BNPD purchases made by affiliated legal entities such as "mail order pharmacies." When no such affiliations exist, they argue that the PBMs nevertheless exercise "dominion and control" over the BNPDs and therefore qualify as "purchasers" under the Act. Plaintiffs contend that the evidence raises an arguable factual issue as to whether or not the agreements that form the basis for this motion qualified certain PBMs as "purchasers."

20. Unfortunately, the parties' briefs are not entirely consistent on the difference between PBMs and TPPs, to the extent there is one. At times, the PBM is described as the agent of the TPP, because it makes the agreement with the manufacturer for the benefit of the TPP's consumers (the "insured"). At other times, the terms seem to be used interchangeably (compare 56.1 Stmt., ¶ 12, with *id.* at ¶ 14). The confusion seems to arise from the parties' attempts at simplifying for trial a multitude of different organizational structures in the health care industry. Fortunately, the inconsistency does not hinder the resolution of this motion. For the limited purpose of deciding this motion, the Court will use the term "PBM" to refer to the pharmacy benefit managers subject to this motion, and "TPP" as the institutional clients (including insurance companies) that contract with PBMs for pharmaceutical services, and which deal directly with consumers.

Finally, plaintiffs assert that PBMs, as affiliates of mail order pharmacies, do compete with designated plaintiffs in the BNPD resale market.

## B. The Agreements

Because the transactions at issue are rather complex, some background is warranted. Although the agreements at issue are technically those between manufacturer and PBM, the plaintiffs take a larger view of the interaction of these and other agreements, including those by which title to BNPDs actually pass to retail and mail order pharmacies via wholesalers. It is therefore prudent to review the related agreements between various actors in the distribution and pricing of BNPDs.[21]

The first agreement entered into is between the PBM and its client. The PBMs act "for the benefit of the plans or payor with which they have contracted." Designated Defendant's Response to Plaintiffs' Statement of Additional Dispute Material Facts ..., (hereinafter "Def. Rep. 56.1 Stmt.") ¶ 11. These PBMs "contract with HMOs, employers, insurance companies, and other entities to manage the drug benefit component of health care plans ..." Def. Rep. 56.1 Stmt. ¶ 11. Presumably, this contract is entered into because

of the cost reductions that PBMs can offer; PBMs are able to and have negotiated lower BNPD costs for their clients through the aggregation of buying power and the threat of switching [22] to a competitor's product.[23] *See id.* at ¶¶ 8, 9.

The PBM then makes a second agreement with the manufacturer. The gist of this agreement is that the manufacturer agrees to "discount" the prices of its BNPDs for the PBM in return for its agreement to either purchase the manufacturer's BNPDs either for itself or on behalf of its client. The discounts at issue here are paid in the form of "rebates." Examples of these transactions, the terms of which are not materially disputed, *see* Def. Rep. 56.1 Stmt. ¶¶ 16, 17, are attached to the Affidavits of Marlene Dubas and Jennifer Driscoll. *See* Dubas Aff. Ex. A–E; Driscoll Aff. Ex. E, F. Generally, the PBM is paid a percentage rebate for every covered prescription filled at a "network pharmacy." *See* Ex. B to Dubas Aff. SE000066660. In other words, the rebate payment to the PBM is based upon and triggered by a patient's actually filling a prescription at a pharmacy. The rebate is then paid to the PBM.[24]

In return for the rebate, the PBM provides the manufacturer a host of services,

**21.** The ordering of the agreements in this memorandum and order is analytic rather than chronological, intended only to outline the transactions at issue.

**22.** The possibility of switching occurs when two BNPDs are considered "therapeutic equivalents." Thus, even though two BNPDs might otherwise be able to obtain lawful monopoly returns for their manufacturers, the buyers' ability to shift demand from one drug to the other forces the manufacturers to compete on price.

**23.** It should be noted that plaintiffs dispute that the application of greater buying power forced defendants to enter into these agreements, because "most health care entities

maintained open or recommended formularies ... [and][r]etail pharmacists were able to override formulary restrictions by obtaining plan authorizations on behalf of their customers for BNPDs excluded from that plan's formulary." Mincy Aff. 27–28. This evidence, however, does not directly contradict the apparent buying power of the PBMs and TPPs central to the economics at issue here. At most, the plaintiffs' expert indicates that some bargaining power remained with both manufacturers and retail pharmacies.

**24.** It appears that the rebate might be paid to the TPP or other entity, but for the purposes of this motion, the Court considers only those instances in which the PBM is paid some or all of the rebate.

including the development and publication of formularies,[25] *see* Ex. A to Dubas Aff. SE000066642, and information on participating pharmacies. *See id.* at SE000066643. It must also "impose penalties to secure the prescribing and dispensing activity in conformity with the direction indicated in the Universal Formularies."[26] *Id.* In short, PBMs provide manufacturers with market information on their products and encourage sales of agreed upon drugs, and in return the manufacturers issue the PBMs a rebate. This is the "quid pro quo" of the second agreement.

The third and final agreement is between the PBM and retail pharmacies. "[T]hird party plans and PBMs contract with retail pharmacies to act as participant pharmacies and set the prescription drug reimbursement rates for participating pharmacies." Designated Plaintiffs' Local Rule 56.1 Statement of Disputed Material Facts (hereinafter "Pls. 56.1 Stmt.") ¶ 5. In this agreement, the parties come to terms on the retail price that the pharmacy will charge participants of TPPs' plans. In return, the pharmacy is admitted as a "participating" or "network" pharmacy. *See* Driscoll Aff., Ex. F, NOVMDL001369. This status provides the retail pharmacy with access to PBM-controlled clients.[27]

Plaintiffs characterize the aforementioned series of transactions as a circuitous means of favoring some purchasers of BNPDs while disfavoring them. Plaintiffs assert that they were resigned to making purchases of BNPDs from wholesalers without the benefit of the rebate. Their argument, in essence, is that even though the rebates are tied to consumer purchases and paid after those purchases are made, they are nothing more than a favorable discount to some buyers. Applying their theory to the legal entities at issue here, they contend that the PBMs are often nothing more than purchasing wings for mail-order pharmacies. By analogy, the argument proceeds, those PBMs which are unaffiliated with any BNPD reseller exercise the same dominion and control over those drugs, and should therefore be considered as purchasers for Robinson–Patman purposes.

**C. Corporate Structure of PBMs**

During the May 26, 2005 oral argument, both parties described the PBM agreements in three groups, each of which was based on the PBM's relationships with legal entities that do take title to, distribute, or resell BNPDs. *See* May 26, 2005 Transcript of Motion ("5–26 Trans.") 83–123. The first group of agreements are with those PBMs which have no legal affiliation with a company that takes title to, resells or dispenses BNPDs and do not do so themselves. The Court will refer to these as "standalone PBMs." The second group are those PBMs that have a legal affiliation—most frequently a parent-subsidiary or co-subsidiary relationship—with an entity that does take title to, resell, or distribute BNPDs. The Court will refer to these as "affiliated PBMs." Finally, the third group of PBMs are those which perform the contracting services described above and which also take title to the

---

25. A "formulary" is a list of drugs with their uses and methods of use, and may include substitutes for the drug.

26. Many of these services are also provided to the HMOs and plans that contracted to have the PBMs act as their buyers. *See* Defs. 56.1 Rep. Stmt. ¶ 11.

27. The parties have extensive disagreements over the amount of pressure exerted by PBMs against retail pharmacies to get them to comply with terms of the agreement, but this dispute is immaterial for the present motion.

drugs, generally through a wholly owned pharmacy. The Court will refer to these as "unified PBMs." Only the stand-alone and affiliated PBMs are subject to the current motion—the defendants have decided to "punt" on the unified PBMs. *See* 5–26 Trans. 91.

In short, the parties dispute in summary judgment how profound the affiliation between two legal entities must be to trigger the Robinson–Patman Act prohibition against price discrimination.

## II. DISCUSSION

The Court applies the well-recognized standards for summary judgment motions discussed *supra*, "Indirect Purchaser Motion" II.A., pp. 9–10.

### A. Elements of a Section 2(a) Robinson–Patman Act Claim

To proceed on their Robinson–Patman claims, plaintiffs must make a factual showing as to all material elements, detailed *supra* "Indirect Purchaser Motion" II.B. pp. 10–14. Here, defendants challenge whether certain agreements make them "purchasers" or whether they can be considered "in competition" with plaintiffs.

### 1. Purchasers

A necessary condition of being a purchaser is that a "sale" be made to the purchaser. *See* 3 P. Areeda & H. Hovenkamp, *Antitrust Law*, 20 (1999) ("Because § 2(a) . . . speaks only of price discrimination between two different 'purchasers,' it does not cover transactions unless they can reasonably be construed as 'sales.' "). There is no special definition of "sale" to be applied under the Act. Instead, courts have resorted to the general law of sales. *See Loren Specialty Mfg. v. Clark Mfg. Co.*, 241 F.Supp. 493, 498–99 (N.D.Ill.1965), *aff'd*, 360 F.2d 913 (7th Cir.1966). *See also Island Tobacco Co. Ltd. v. R.J. Reynolds*

*Indus. Inc.*, 513 F.Supp. 726, 733 (D.Haw. 1981); *Kennedy Theater Ticket Serv. v. Ticketron, Inc.*, 342 F.Supp. 922, 925 (E.D.Pa.1972) (courts have generally looked to the indicia of sales law and transfer of title).

Even though the case law does not clearly define what constitutes a sale, some parameters are apparent. When parties act as intermediaries for a transaction and do not buy and resell the commodities, no sale between them has occurred. *See Metro Commc'ns Co. v. Ameritech Mobile Commc'ns*, 984 F.2d 739, 746 (6th Cir.1993). A consignment, whereby market risks remain with the consignor, for example, cannot constitute a sale. *See* 14 Hovenkamp, Antitrust Law, ¶ 2312b, 21; *Loren Specialty*, 360 F.2d at 913 ("Preferences granted to a legitimate sales agent are not actionable because there is no sale to the agent"); *Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 373 (3d Cir.1985) (discussing preferences given by seller to seller's agent) (citing *United States v. General Electric Co.*, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926)).

### B. Stand Alone PBMs

Defendants contend that all PBMs subject to the motion "are not 'purchasers' within the meaning of the Act . . . [because] . . . title to the goods must pass from the seller to the 'purchaser' or at a minimum, the 'purchaser' must exercise dominion and control over the goods." Correspondingly, defendants argue that the rebate transactions cannot constitute "sales," since PBMs never take possession of the BNPDs.

### 1. Are they "purchasers"?

Plaintiffs assert that to be a "purchaser" under the Act, one of two standards must be met: 1) title must pass from the seller

to the purchaser; or 2) the purchaser must exercise dominion and control over the goods. Although the difference between these two standards is not entirely clear, it has been noted in the case law. *See, e.g., Reines Distribs., Inc. v. Admiral Corp.,* 241 F.Supp. 814, 815 (S.D.N.Y.1964); *Baim & Blank,* 148 F.Supp. 541 (holding that subsidiary that set its own pricing policies was an independent legal person and therefore a different seller from parent); *see also Loren Specialty,* 241 F.Supp. at 493 ("For a sale to occur there must be a transfer of title. Dominion and control of the goods seems to be essential in arriving at a determination that a vendor-purchaser relationship exists."); *Standard Fashion Co. v. Magrane–Houston Co.,* 258 U.S. 346, 354, 42 S.Ct. 360, 66 L.Ed. 653 (1922) ("Full title and dominion passed to the buyer. While this contract is denominated one of agency, it is perfectly apparent that it is one of sale."). Defendants concede that the language of dominion and control exists in the case law, but do not agree in the expansive scope plaintiffs accord it. *See* Defs. Mem. Law 5.

Plaintiffs admit that stand alone PBMs do not "take title," and therefore can only be considered purchasers if they exercise "dominion and control" over the goods. *See* 5–26 Trans. 114. However, plaintiffs do contend that "dominion and control" is enough to violate the Act.[28] They assert that dominion and control is expressed by controls which stand alone PBMs exert over BNPD distribution: purchase prices, formulary limitations, resale prices, retailer participation, and reimbursement rates.

*See* Memorandum in Opposition to Designated Defendants' Motion for Partial Summary Judgment as to All Robinson–Patman Act Claims Based on Rebates Paid to Legal Entities that do not Take Title to, Resell or Dispense Brand Name Prescription Drugs ("Plt. Memo in Opp.") at 19. In short, plaintiffs argue that the influence that stand-alone PBMs exert over rebate terms and the pressure it can bring to bear on insurers, insureds, and retail pharmacies qualify as "dominion and control" of the BNPDs themselves.

The plaintiffs' theory is unpersuasive because their application of "dominion and control" is not substantiated by the case law. It has been referenced only in contexts very different from the present. Importantly, the cases to which plaintiffs cite discuss either of two situations inapposite to the present case: (1) when there is a question of whether or not an intra-corporate transfer of goods has affected a "sale," courts look to whether the receiver exercised "dominion and control" over the product exclusive of the corporate parent; or (2) when a court must discern between a sale and a consignment, courts look to see if the consignee exercises "dominion and control" as an indicia of ownership. Critically, liability in these instances has been found only when there has been a formal transfer of either title or possession to the purchaser. Where it has not existed, no court has found a sale.

The relevant case law shows that defendants must transfer title or possession to

---

**28.** Plaintiffs also argue that 80% of all PBMs do, in fact, take *title* to the goods, because they are affiliated with or own entities that undeniably do so. *See* Memorandum in Opposition to Designated Defendants' Motion for Partial Summary Judgment as to All Robinson–Patman Act Claims Based on Rebates Paid to Legal Entities that do not Take Title to, Resell or Dispense Brand Name Prescrip-

tion Drugs ("Plt. Memo in Opp.") at 15. Setting aside the question of whether or not affiliation with a BNPD purchasing company permits an inference of title-taking, it is clear that this argument carries no weight in the stand-alone context, where no such ties exist. Aggregate analysis of the industry is too general to sustain plaintiffs through summary judgment with respect to stand-alone PBMs.

stand-alone PBMs for the question of "dominion and control" to arise. First, in *Reines,* the plaintiff moved for a pretrial order determining that a subsidiary was sufficiently distinct from the parent to qualify as a "purchaser" (and therefore competitor) under the Act. The Court found that this was a question of fact that could not properly be determined on summary judgment. *See Reines,* 241 F.Supp. at 815. Unlike the present case, there was no question in *Reines* that the subsidiary had obtained title in the more restrictive, actual possession-based sense of the term. The dominion and control inquiry was limited to the subsidiary's dominion and control over the goods, exclusive of the parent's control. Here, with respect to stand-alone PBMs, the question of dominion and control does not arise because there is no possession.

In *Baim & Blank,* the case from which the "dominion and control" language in *Reines* is purportedly derived,[29] the court essentially addressed a question of whether or not the indirect purchaser doctrine would apply. Plaintiff-retailer sued manufacturer and its wholly owned distributors based upon favorable pricing given by those distributors to plaintiff's competitors. Defendant contended that although the manufacturer owned its distributors, the evidence indicated that pricing and sales policy were determined by each distributor. Since no control was exercised over pricing the manufacturer could not be liable for the distributor's pricing policies and, in that case, there would be no evidence that discriminatory pricing was performed by a single seller. Plaintiff failed to persuade the court that the manufacturer and its distributors qualified as a single seller offering discriminatory pricing to plaintiff's competitors. In *Baim & Blank,*

to the extent there was an inquiry into dominion and control, the analysis involved whether the corporate affiliation between the two entities qualified them as a single seller—a separate question from whether defendants exercise enough control over the selection and pricing of a good which they never actually come to possess.

*Island Tobacco Co.,* 513 F.Supp. 726, also provides little support for the plaintiffs "dominion and control" argument. In that case, the defendant holding company transferred tobacco products to its wholly-owned subsidiary distributor. In deciding that the transfer between the manufacturer and the wholly-owned subsidiary did not constitute a "sale" under the act, the court adopted the Fifth Circuit position as announced in *Security Tire & Rubber Co. v. Gates Rubber Co.,* 598 F.2d 962 (5th Cir. 1979), cert. *denied,* 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1979), that a transfer to a wholly-owned subsidiary could not qualify as a "sale" under the Act. *Id.* at 965. In a more limited holding, the Supreme Court later adopted a similar position in *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Again, the case did not revolve around the issue presented here—whether or not "dominion and control" over the product can exist without possession or title—but instead on the independence of a subsidiary corporation, and whether the transfer of possession also included the passing of dominion and control.

The case law simply does not reach far enough to embrace plaintiffs' notion of "dominion and control," and this Court refuses to extend it that far. These "dominion and control" cases deal with the legal significance of intra-enterprise transfers, or sale-like transactions and not, as in the

---

**29.** Interestingly, the phrase "dominion and control" is not used a single time in the *Baim* & *Blank* case. *See Baim & Blank v. Philco Corp.,* 148 F.Supp. 541 (E.D.N.Y.1957).

present case, the question of whether or not a PBM has exerted significant enough control over property transferred between a manufacturer and a third-party purchaser so as to constitute a "purchase" of the property. Emphatically absent from these cases is the legal rule that would save the plaintiffs' argument—that is, a rule that would provide that some combination of the alleged controls exerted by stand-alone PBMs would constitute "dominion and control" over the BNPDs themselves, thus qualifying the defendants as "purchasers" under the Act.[30] Even if plaintiffs could meet their own standards for dominion and control it would not matter, since with a transfer of title or possession, there has been no sale (and thus no "purchase") that would justify an inquiry into the substance of a transaction.

Ultimately, plaintiffs' argument amounts to the contention that stand-alone PBMs exercised control over purchasing choices of both TPPs and consumers and that this constituted "dominion and control" over the goods. The case law does not support such a charitable reading of "dominion and control." First and foremost, the terms are used to describe a party's relationship with the goods or commodities in question, not the influence it exerts upon other transactions.

The other cases cited by the plaintiffs are equally unavailing.[31] In *Loren Specialty*, 241 F.Supp. 493, plaintiff sued defendant manufacturer and competitor distributors because of favorable prices they had received from the manufacturer. Unlike the aforementioned cases, the defendants here were unrelated legal entities. The question before the Court was whether the nominal "agency" distribution agreements between defendant manufacturer and distributors were in fact sales. *See id.* at 495. The Court found that they were not, citing the determinative facts.[32]

*Loren Specialty* taught that the Court should look to the substance and not the

---

**30.** Although the argument is not explicitly raised in the plaintiffs' briefs, the essence of their argument might be a claim of "constructive possession." The sum of controls that plaintiffs allege do not constitute constructive possession. Moreover, a review of their analysis indicates something much more far-fetched. Namely, that by controlling consumer preference, one controls the product. That proves too much.

**31.** Plaintiffs also cite to a series of Sherman Act cases in which insurers were found to be purchasers of medical services. *See* Pls. Mem. Law at 19–20 (citing *Desiano v. Warner–Lambert Co.*, 326 F.3d 339 (2d Cir.2003); *Kartell v. Blue Shield of Massachusetts*, 749 F.2d 922 (1st Cir.1984); *Westchester Radiological Assocs. v. Empire Blue Cross & Blue Shield, Inc.*, 707 F.Supp. 708 (S.D.N.Y.1989), *aff'd*, 884 F.2d 707 (2d Cir.1989)) (additional citations omitted). Throughout this Memorandum & Order these cases are referred to as the *"Kartell"* cases. For the reasons stated *supra* SM–HMO Motion III.B.1. and infra Non–Purchaser Rebates Motion II.B.2.b. for

rejecting the applicability of this line of cases the Court also rejects their application here.

**32.** The Court in *Loren Specialty* relies on analysis in *Mathews Conveyor Co. v. Palmer–Bee Co.*, 135 F.2d 73, 81 (6th Cir.1943) to list the relevant factors for separating agency from sale transactions:

From a consideration of the evidence and a review of the foregoing cases, we arrive at the conclusion that the contract was one of sale and not of agency. The products were bought outright from plaintiff by defendant. The latter dealt directly with its own customers in securing orders and in delivering and installing the equipment. It billed such customers in its own name, assumed all credit risks for payment, and, having obtained full title to the goods, exercised complete control over them, including installation and erection, as well as assuming all liability incidental thereto. It engaged on its own behalf in procuring business for plaintiff's products and carried on its own business for itself, and not for plaintiff. *Id.* at 81.

mere form of a transaction. *See* 241 F.Supp. at 500. However, it did so only when, in substance, the goods had actually been transferred to the distributor. Here, there is no allegation that such transfers were made to stand-alone PBMs. *Loren Specialty* does not contemplate looking beyond this lack of quintessential substance to analyze "dominion and control" over the aspects of another transaction.

▆ When plaintiffs' evidence regarding these transactions is evaluated to determine whether stand alone PBMs exercise "dominion and control" over BNPDs, and granting plaintiffs every inference, it is clear that they aver no facts that would create an issue of material facts, even under their proposed standard. They contend that PBMs ". . . actively manage the pharmacy benefit," Watson Aff. ¶ 26 (attached as Defs. Ex. D to Driscoll Decl.), ". . . demand discounts of payments for 'formulary access' or to become a 'preferred' product . . . ," Watson Aff. ¶ 29, and sometimes ". . . assume financial risk for the providing of the pharmacy benefit such that . . . the entity benefits from pharmaceutical cost-containment strategies," Watson Aff. ¶ 42. Plaintiffs describe the variety of ways that PBMs exert influence over insurers, end-users, retail pharmacies and mail-order pharmacies, but this is not evidence of control over the goods. Control over consumer, insurer, or retail pharmacy preferences for the goods are not the same as control over the goods themselves, and none of the cases cited by plaintiffs

come close to bridging this analytical gap. Furthermore, the PBMs under consideration here do not take title to BNPDs, they assume no credit risk in their transfer, and they play no part in their shipping or distribution. The statutory language is clear: the favored competitor must in fact be a purchaser. Plaintiffs fail to identify one.

Viewed "in the light most favorable to the party against whom summary judgment is sought" and drawing "all reasonable inferences in his favor," the evidence might support an assertion that the stand-alone PBMs are a significant force in the prescription drug marketplace, but it would not establish evidence of a "purchase." The defendants' motion is therefore granted with respect to this class of agreements.[33]

### 2. Are they "in competition"?

### a. Is there functional competition?

The standards governing a determination of whether or not two entities are in competition with each other are derived from *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 141 (2d Cir. 1998) and discussed *supra,* SM–HMO Motion III.A.2. Because plaintiffs cannot show that stand-alone PBMs take title to BNPDs, the Court need not reach the question of whether or not they are in competition with plaintiffs. Nevertheless, even if a "dominion and control" analysis would indicate that stand-alone PBMs are, in fact, purchasers, they cannot be consid-

---

**33.** Defendants urge the Court to treat these agreements as nothing more nor less than a consignment or agency relationship. *See* Defs. Mot. at 6. Jurisprudence under the Act has not considered consignments to be sales. *See* 3 Kintner and Bauer, *Federal Antitrust Law* 198–202 (1983). The Court's decision here does not reach so far as to make a determinative finding as to whether or not these agreements, as a matter of law, are

"consignments." Today's decision is grounded in the lack of a showing of a "purchaser" under these agreements, combined with the fact that two totally unaffiliated legal entities cannot be considered a single-entity under antitrust analysis—a matter discussed in the second half of this opinion. Should the issue become relevant in subsequent litigation, the Court will revisit it.

ered competitors under the Act because they do not operate at the same functional level.

Although the determination of whether or not actual competition exists is a factual one, to extend that reasoning to the present motion for summary judgment would swallow the requirement that the competition between favored and disfavored purchasers be *functional*. Assuming, *arguendo*, that stand-alone PBMs do exert control over prices throughout the chain of BNPD distribution, plaintiffs make no showing of functional equivalence aside from an assertion by one of plaintiffs' experts that retail pharmacies could and would perform the same services as PBMs. *See* Mincy Aff. ¶¶ 98–101.

In effect, plaintiffs' argument leap frogs the "functional competition" analysis and proceeds directly to the impact that the exertion of purchasing power by PBMs has upon their profit margins. It may very well be the case that in acquiring rebates from manufacturers and price ceilings from participating pharmacies, PBMs obtain some profits from pharmaceutical sales that might otherwise go to retail pharmacies. This alone, however, does not show that stand-alone PBMs and retail pharmacies are in functional competition. If it did, it would provide no logical stopping point from considering parties at all

levels in the chain of distribution from being in competition with each other. The Act does not regulate how the spoils of business are distributed vertically through the chain of distribution; instead, it levels the playing field at each functional step in that chain. For this reason, the loss must result in the reduction of the plaintiff's ability to compete with the favored purchaser. *See, e.g., Morton Salt,* 334 U.S. at 47, 68 S.Ct. 822. Here there is no showing that retailers and stand-alone PBMs were engaged in such competition.

Plaintiffs' primary response to defendants' assertion of non-competition is that the factual record says otherwise—but the arguments are unavailing against stand-alone PBMs. They say that "retail pharmacies directly and intensely compete with PBMs and third-party payors....[This is] illustrated by the PBMs who own and operate mail order pharmacies." Pls. Memo in Opp. at 25. The brief contends that "some health care plans, including IPA-model HMOs, own and operate in-house and mail order pharmacies that directly compete with retail pharmacies." Pls. Memo in Opp. at 27 (citing Mincy Aff. ¶¶ 53, 160, 182). These allegations are irrelevant for the class of stand-alone PBM agreements under consideration here.[34] Thus, the Court holds that plaintiffs have not produced a genuine factual dispute on

---

**34.** The plaintiffs do contend that retail pharmacies face competition from health care plans which do not own and operate in-house or mail-order pharmacies. *See* Pls. Memo in Opp. at 28. This contention is unsubstantiated by the Mincy Affidavit referred to. It states: "Health plans, and other third-party payors, also vigorously compete with retail pharmacies for BNPD customers. These health plans often designed their prescription drug benefit plans so that their members (BNPD customers) are either exclusively required to use, or given a financial incentive to use, the in-house or mail order pharmacy owned by or contracted with the health plan."

Mincy Aff. ¶ 182. The gist of the contention, like the vast majority of the plaintiffs' arguments on competition, deal with PBMs that are either affiliated with or in an ownership relationship with a pharmacy. Whatever "issue" might be raised by the phrase "contracted with" in the Mincy Affidavit, it is not sufficient to raise a genuine issue of material fact with respect to stand alone PBMs. As discussed above, the affiliated PBMs present the problem of whether or not the companies are in fact a single entity, making the plaintiffs' evidence here potentially relevant in the affiliated PBM context. *See supra,* pp. 406–09.

whether or not stand-alone PBMs are "in competition" with them.

### b. Is *Kartell* applicable?

Although plaintiffs fail to make a showing of functional competition, it is not, as defendants suggest, because PBMs merit treatment as "buyers" under *Kartell,* 749 F.2d 922. Defendants assert that, to the extent that stand-alone PBMs are considered purchasers under the Robinson–Patman Act, it should be by analogy to insurers as interpreted by *Kartell* under the Sherman antitrust laws. *See* Defs. Rep. at 7–10.

Defendants' plea for the application of *Kartell* proves too much in the Robinson–Patman context. It would eviscerate the Robinson–Patman Act. In theory, all retailers are purchasers for the benefit of their consumers. In a competitive market economy, retailer and consumer interests are aligned in controlling costs emanating from higher up in the distribution chain. Retailers are interested in receiving lower prices, which they might pass on to consumers to increase sales volume, and consumers are interested in paying the lowest price possible for any given product. The same logic would apply to wholesalers in their negotiation with distributors, or distributors in their negotiations with manufacturers. If the Court were to accept defendants' position, these companies would be able to escape "favorable purchaser" status by being considered purchasers on behalf of end-users, particularly with respect to PBMs that might also be considered sellers, it would permit all varieties of price discrimination currently prohibited by the Act. Defendants' argument offers no logical stopping point if extended to cover this case.

The analysis of this argument in the context of the SM–HMO Motion is applicable here.[35] In essence, the difference between the two acts and the fact that this line of cases has never been applied in the Robinson–Patman context inveighs against importing the exception whole cloth.

### C. Affiliated PBMs

#### 1. Movant's burdens of production

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Although the movant need not introduce evidence, *see id.,* the movant must inform the court of the basis of its motion. *See* 11 Moore's Federal Practice § 56.13[1] (3d ed.2000) (citing *Williams & Sons Erectors v. S. Carolina Steel,* 983 F.2d 1176, 1183–84 (2d Cir.1993)) (finding in the context of contract interpretation that the presence of an ambiguous clause in contract raised sufficient issue of fact precluding grant of summary judgment).

As Justice White noted in *Anderson v. Liberty Lobby,* trial courts should act with caution in granting summary judgment, and they may deny it when there is reason to believe the better course would be to proceed to a full trial. *See* 477 U.S. at 255, 106 S.Ct. 2505 (White, J., concurring). A court might reject summary judgment when the factual record has been inadequately developed with respect to determinative issues in the case. *See United States v. Small,* 24 F.R.D. 429, 431 (S.D.N.Y.1959). Exactly what the law requires movant to show is subject to some debate. Nevertheless, in Justice White's concurrence in *Celotex* he noted that, "[i]t is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the

---

**35.** The detailed discussion of *Kartell* is located *supra* SM–HMO Motion III.B.1.

plaintiff has no evidence to prove his case." 477 U.S. at 328, 106 S.Ct. 2548 (White J., concurring).

### 2. Movants' production

■ As defined for the purposes of this motion, affiliated PBMs are those companies that have a corporate affiliation with a pharmacy which does take title to, resell, or dispense BNPDs. In the affiliated PBM context, the tripartite division of PBM organizational structures proffered by the parties seems simple enough, but conceals a complex web of corporate relationships that might play some role in determining liability. During oral argument, both parties agreed that affiliated PBMs might include companies in parent-subsidiary and sibling-subsidiary relationships. *See* 5–26 Trans. at 92, 112–13. The affiliated PBM category might include affiliates that are partly owned, majority owned, or fully owned by a third company. It appears, therefore, that the affiliated PBM category is an amorphous one that serves as a catch-all for a variety of legal arrangements between PBMs that bargain for rebates and affiliated pharmacies that actually purchase BNPDs. It also appears that within defendants' affiliated PBM category there would be factual differences relevant to a summary judgment determination of the matter. Despite the wide variety of possible and relevant legal relationships that affiliated PBMs might have to resellers of BNPDs, defendants make no attempt to clarify to which of these many companies their motion should apply.[36] Without a more precise proffer of what is at stake, the Court finds it premature to decide an issue better fit for trial.

Although the defendants do not move for summary judgment with respect to

unified PBMs, their use of the unified PBMs as an analytical counterweight warrants discussion. Were the plaintiffs' claims with respect to unified PBMs inadequate to survive summary judgment, that determination would apply *a fortiori* to affiliated PBMs, mooting the significance of the ambiguous affiliated PBM category. But plaintiffs have produced evidence that, taken in the best light, permits the litigation to survive dismissal.

For the purposes of this motion, it is not disputed that unified PBMs include pharmacies that do take title to, resell and/or dispense pharmaceutical drugs. Plaintiffs have also provided evidence in the form of exhibits, producing material from websites and 10–K statements indicating as much. *See* Iovieno Decl. at IX 1; IX 2; IX 3; IX 4; IX 8; IX 9. The companies described include Medco Health Solutions, Inc., Caremark, and Express Scripts. Defendants do not contest the structure of these organizations, arguing only that they are not subject to the motion. *See* Def. Rep. at 3, 10. Furthermore, it is not contested at this point in the litigation that the mail-order components of these organizations are "purchasers" of BNPDs.

Likewise, plaintiffs provide evidence of competition between mail-order pharmacies owned by unified PBMs and themselves, including information on a market-wide decline in sales for retail pharmacies and a corresponding increase for mail-orders, *see* Mincy Decl. at MX56, MX57, providing some basis for viewing retail and mail-order pharmacies as "competitors." Even more relevant is a document analyzing emerging mail-order competition with respect to particular BNPDs produced by Searle. *See, e.g.,* Searle Memorandum

---

**36.** Defendants do identify several PBMs which they assert are "affiliated" with BNPD resellers, but move for summary judgment with respect to all affiliated PBMs as a class. *See* Def. Rep. Mem. at 11.

from Kathryn Giusti to K. Mann, May 1, 1992 ("Giusti Memo") at MX 32 SE000020267–89. The Giusti Memo notes that retail customers often switch to mail order operations to reduce their costs. *See id.* at SE000020274. In a discussion of the prescription sales in the anti-arthritic drug market, the report compared retailer and mail-order sales volume. *See id.* at SE000020283. From this report, a reasonable trier of fact could draw the inference that mail-order pharmacies compete with retail pharmacies for BNPD sales. *See id.* at SE000020281, SE000020286. From this evidence it is apparent that plaintiffs would survive a motion for summary judgment with respect to unified PBMs. Whether or not plaintiffs could make a similar case with respect to affiliated PBMs would require the Court to decide an additional issue, single entity analysis, discussed *infra*—that is, whether rebates given to one affiliate and purchases made by another constitute a single transaction with a single entity.

At root, the problem with defendants' motion is that it is little more than the assertion of an intermediary category of corporate structures, undefined to the Court, which, it is contended, cannot as a matter of law violate the Act. Were the Court to permit this type of argument on summary judgment, it would be forced to enter into an analysis of untold complexities and unbriefed legal analyses. In complex cases such as this one, it would impose asymmetric burdens on non-movants, who would be forced to produce evidence to counter unsubstantiated theoretical parsing of the case by defendants. The movants must offer at least some initial kernel of clarity with respect to the factual disputes. Sweeping categories of legal entities do not suffice.

An examination of the underlying purposes of motions of partial summary judgment endorse this decision. First, there is very little to be gained in trial expediency if the motion is granted with respect to affiliated PBMs. Plaintiffs' claims with respect to unified PBMs would remain unscathed by this motion, and in any event this Court and the parties would be left with the task of deciding which agreements were subject to the motion.

Second, although it is useful to allow summary judgment to clarify the precise range of dispute in complex antitrust cases, there is nothing to be gained by deciding whether the catch-all category of affiliated PBMs are more akin to stand alone or unified PBMs. To the extent that any can be brought to this dispute, today's decision narrows the case to the question of whether or not a given set of parties should be considered a single entity for the purposes of the act. Nothing more could be achieved by taking a blind stab in the dark as to the single entity standing of organizations that have hardly been identified to the Court.

Finally, the relevant facts here will require the Court to decide how far antitrust "substance over form" analysis should protrude into Robinson–Patman jurisprudence with respect to affiliated entities. A guiding principle of antitrust law is "that substance and true competitive function control rather than corporate form." *Sec. Tire & Rubber Co. v. Gates Rubber Co.*, 598 F.2d 962, 965 (5th Cir.1979), *cert. denied*, 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1979); *see also Loren Specialty*, 241 F.Supp. 493. This guiding principle cuts to the core issue in dispute in this case—whether or not the rebate transactions and separate sales of BNPDs to a PBM-affiliate constitute a single transaction with a single entity.

The law governing single-entity consideration for the purposes of antitrust law stems from *Copperweld Corp.*, 467 U.S.

752, 104 S.Ct. 2731, 81 L.Ed.2d 628. There, a tubing company sued another tubing company and its parent corporation as well as others under the conspiracy prong of the Sherman Act. The issue facing the Supreme Court was whether or not a parent and its wholly owned subsidiary were legally capable of conspiring with each other under section 1 of the Sherman Act. *Copperweld* held that, for purposes of § 1, all wholly-owned subsidiaries could not conspire with their parent corporation. *See Copperweld,* 467 U.S. at 777, 104 S.Ct. 2731. The Court reasoned that the identity of interest made the inquiry into actual details of ownership and control unimportant.

This holding has been applied in the Robinson–Patman context as well. *See Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.,* 772 F.2d 214 (6th Cir.1985) ("the parent and subsidiary are a single economic unit. The Robinson–Patman Act is not concerned with transfers between them."); *Sec. Tire & Rubber Co.,* 598 F.2d at 965–67 (making a pre-*Copperweld* determination that a tire manufacturer's sales to its wholly-owned subsidiary could not constitute the basis for a price discrimination claim). Indeed, in *City of Mt. Pleasant, Iowa v. Associated Electric Cooperative,* 838 F.2d 268 (8th Cir.1988), the Eight Circuit affirmed a district court's dismissal of Robinson–Patman price discrimination claims on the basis that the purported "sales" of electricity by a rural electric cooperative to its subsidiary retail and distribution cooperatives at favorable prices could not constitute a sale, because they were not separate entities, despite their cooperative forms, which were governed by the Rural Electrification Act of 1936, 7 U.S.C. §§ 901–06. The rationale for this cross-application is that the economic substance of a transaction, and not mere corporate formalities, should control the application of the antitrust laws.[37] Along these lines, the Eighth Circuit found that "the logic of *Copperweld* reaches beyond its bare result, and it is the reasoning of the Court, not just the particular facts before it, that must guide [the] determination." *Id.* at 274. The Eighth Circuit went on to assert that the essence of *Copperweld* was that "economic reality, not corporate form, should control the decision of whether related entities can conspire." *Id.* at 275. It would be anomalous, the court reasoned, to give single entity status to certain forms of corporate organization under § 1 of the Sherman Act, while not following a similar mode in considering those same entities under 2(a) of Robinson–Patman. *Id.* at 279. *Accord, Bishop v. GNC Franchising LLC,* 403 F.Supp.2d 411 (W.D.Pa.2005).

Whether or not *Copperweld* applies to multiple entities on the buyer's side of a section 2(a) price discrimination claim is a question of the first instance. Its novelty alone, however, does not necessarily make *Copperweld* inapposite. In an area of such legal complexity as the antitrust laws, judicial discretion counsels against granting summary judgment when the parties have failed to brief the relevant law.[38]

---

**37.** As noted in *Copperweld:*

At least when a subsidiary is wholly owned, however, *these factors are not sufficient* to describe a separate economic entity for purposes of the Sherman Act. The factors simply describe the manner in which the parent chooses to structure a subunit of itself. They cannot overcome the basic fact that the ultimate interests of the subsidiary and the parent are identical, so the parent and the subsidiary must be viewed as a single economic unit.

*Copperweld,* 467 U.S. at 772, n. 18, 104 S.Ct. 2731 (emphasis added).

**38.** In mid-July, 2005, over a month and a half after oral argument, and several months after the briefing schedule, plaintiffs submitted a sur-reply brief that was not requested by the Court but briefed the issues discussed here.

### 3. Defendants' other arguments

Defendants make several other arguments that merit discussion. None of these arguments can overcome the genuine issues raised by plaintiffs. First, defendants' application of *Kartell* which this Court has found not applicable to stand alone PBMs is even less applicable here. Even if *Kartell* was applicable in the Robinson–Patman context, the Court would still have to make a determination of whether or not they could be considered end-users if they maintained a corporate affiliation with a BNPD reseller. In that case, the rebate transaction and the BNPD purchase might arguably flow to that single entity.

Similarly, the defendants' second argument that the plaintiffs "flip-flop" in alternately assigning the manufacturer rebate to either the PBM or its affiliated-purchaser is unpersuasive. Defendants contend that plaintiffs "assign" the rebate to stand-alone PBMs, while reversing course in the affiliated PBM context by "assigning" the rebate to the affiliated purchaser. However, the legal significance of the plaintiffs' position is that affiliated PBM and affiliated purchaser are, for the purposes of the Robinson–Patman Act, a single entity, and that therefore the rebate transaction and the BNPD purchase are, in fact, two parts of a single transaction with a single entity.

Third, defendants argue that the connection between an affiliated PBM and affiliated pharmacy is irrelevant, since "the amount of the rebate is the same whether the BNPD is dispensed by a mail order pharmacy or by a retail pharmacy. Thus, if the health plan is affiliated with, or even owns, a mail order pharmacy, the rebate is the same for a BNPD dispensed by that pharmacy as it is for a drug dispensed by a retail pharmacy in the PBM's or HMO's 'retail pharmacy network.' " Defs. Rep. at 12 (emphasis omitted). Defendants argue that the ramifications of this fact are twofold. First, they argue that it undercuts the plaintiffs' claim that the rebates create plan incentives for members to use an affiliated mail-order pharmacy. Second, they contend that since the rebates are competitively neutral, they do not offer any advantage to the receiving PBM or its affiliated pharmacy, since they will receive rebates regardless of whether the BNPDs are purchased at a retail or mail-order pharmacy.

This does not squarely address the plaintiffs' preoccupation with rebates paid to one branch of a single-entity that also purchases and resells BNPDs. It is a preoccupation at the heart of the Robinson–Patman Act-that large buyers should not be permitted to employ economies of scale to extract favorable pricing at the expense of their smaller competitors. The purpose of the Act was " 'to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power.' " *Sano Petroleum,* 187 F.Supp. at 353 (citing *Henry Broch & Co.,* 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124); *see also The Evolution of the Robinson–Patman Act: A Twenty–Year Perspective,* 57 Colum.L.Rev. 1059, 1061 (1957) (arguing that the Act was an effort to preserve traditional marketing channels against the encroachment of mass distribu-

---

Rule IV.B of the Individual Rules of this Court states that "sur-reply papers shall not be filed or considered." Individual Rules of Senior Judge I. Leo Glasser, March 22, 2006. Shortly thereafter, defendants requested that the Court ignore the arguments not raised in plaintiffs' timely response papers, or, in the alternative permit defendants to file a sur-reply addressing the relevant issues.

In reaching its decision today, the Court does not consider the arguments made in either parties' sur-replies.

tors and chains); Hovenkamp, 14 *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, 98 (1999) (contending that, "[t]he real gravamen of the offense declared by the . . . Act was powerful buyers . . . that forced suppliers to give them concessions that other buyers did not receive").

The motivating fear behind the Act is that favored pricing will allow one party to resell at lower prices, gain market share, and perhaps run its competitors out of business. The Act exists as a stop-gap measure against the development of market power, particularly monopsony power. This concern, as articulated in terms of this case, is that affiliated PBMs will pass their rebates on to mail-order affiliates (or that unified ones will do so internally), which will use them to out-compete retail pharmacies. Even if defendants are correct that the rebate is paid to the PBMs or TPPs regardless of whether or not the BNPDs are disbursed from a retail or mail-order pharmacy, that showing is not enough, because the Act makes discriminatory pricing and terms illegal, regardless of how they are provisioned.[39] *See Indian Coffee Corp. v. Procter & Gamble Co.*, 752 F.2d 891, 902 (3d Cir.1985), *cert. denied, Folger Coffee Co. v. Indian Coffee Corp.*, 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 150 (1985) (district court must consider offering of customer coupons to only some retailers as a form of price discrimination); *O'Connell v. Citrus Bowl*, 99 F.R.D. 117, 122 (E.D.N.Y.1983) (prompt payment discount offered to some buyers but not others constitutes discrimination); *Diehl & Sons v. Int'l Harvester Co.*, 445 F.Supp. 282 (E.D.N.Y.1978) (higher truck allowances given to some buyers could constitute discrimination); *Guyott Co. v. Texaco*, 261 F.Supp. 942, 948–49 (D.Conn.1966) (waiver of shipping charge to some buyers but not others constitute price discrimination).

Therefore, the opportunity to receive rebates triggered by actual resales to end users may constitute a form of unlawful favoritism, when only one of several resellers has access to the benefit. That is enough to survive summary judgment.[40]

## III. CONCLUSION

For the foregoing reasons, defendants' motion for partial summary judgment on plaintiffs' claims under the Robinson–Patman Act, 15 U.S.C. §§ 13(a), 13(d) & 13(f), is granted with respect to PBMs that do not take title to, resell, or dispense brand name drugs and denied with respect to PBMs that are affiliates of entities that take title to, resell or dispense brand name drugs.

## *DAMAGES MOTION*

## I. INTRODUCTION

Pending before the Court is a motion for summary judgment submitted by the designated defendants relating to the representative plaintiffs' claims under the Robinson–Patman Act, 15 U.S.C. § 13(a) (the "Act") on the ground that plaintiffs have not shown that they are entitled to damages under the Act. Having carefully reviewed the papers submitted by the parties, and as set forth below, the Court

---

**39.** There are, of course, several statutory defenses available to defendants, which have yet to be raised and are not considered here. *See* 15 U.S.C. § 13.

**40.** To the extent that plaintiffs' argument is an assertion of a lack of "antitrust injury" entitling them to damages under § 4 of the Clayton Act, it is discussed in the Court's Memorandum and Order on "Defendants Motion for Summary Judgment on the Ground that Plaintiffs have not Shown That They are Entitled to Damages Under the Act."

grants defendants' motion for summary judgment on the ground that plaintiffs have failed to show they are entitled to damages.

## II. BACKGROUND

In response to interrogatories, plaintiffs stated that the amount of sales and profits they allegedly lost due to defendants' price discrimination would "be the subject of an expert report." *See* Pls. Opp. 56.1 Statement ¶ 3. The plaintiffs submitted an expert report on or about September 29, 1995 (the "1995 Expert Report"), which included Robinson–Patman Act damage calculations. *See* Grass Decl. Ex. 3. The 1995 Expert Report did not include final Robinson–Patman Act damage calculations for the plaintiffs because all of the data required for such calculations was not then available from Chicago Partners, plaintiffs' data management experts, due at least in part to plaintiffs' receipt of the data only shortly prior to the court-ordered deadline for submission of expert reports. *See* Pls. Opp. 56.1 Statement ¶ 4.

Plaintiffs have been granted the right to supplement "their expert report with Chicago Partners data" provided that "the identity of the expert and the basic theory of damages ha[s] not also been changed." Declaration of Steven I. Froot ("Froot Decl.") executed on February 28, 2005, Ex. 1, attaching September 1, 2004 Court transcript. Therefore, to the extent that defendants successfully cast doubt on the validity of the damages theories set forth in the 1995 Expert Report, any supplementation by plaintiffs would not fortify the theories because only the data, but not the underlying theories, would change. This Court expressly came to such a con-

clusion in an order issued on February 4, 2005, consistent with the express language of the 1995 Expert Report. *See* Pls. Opp. 56.1 Statement, attaching order; Grass Decl. Ex. 3 ("additional calculations described in Section X [of the 1995 Expert Report] will be completed as the necessary data and information are obtained").[41]

The 1995 Expert Report sets forth plaintiffs' Robinson–Patman Act damages calculations in sections X and XI. *See* Grass Decl. Ex. 3. According to plaintiffs' experts, "[r]etrospective price discrimination damages consist of four components: 1) Lost profits on actual sales where the profits were lost as a result of the price discrimination; 2) Lost profits on lost sales of BNPDs where the sales and profits were lost as a result of the price discrimination; 3) Lost profits on lost sales of products other than BNPDs ("lost ancillary profits") where the sales and profits were lost as a result of the price discrimination; and 4) special damages resulting from the price discrimination." Grass Decl. Ex. 3 at 144. Lost profits on actual sales of BNPDs "have been determined by multiplying actual sales volume for each BNPD sold by the" designated plaintiffs "by the amount of the increase in the profit margin for that drug that would have occurred if there had been no price discrimination." *Id.* Plaintiffs' experts also calculated lost profits on sales not realized because of the purported discrimination "by multiplying the lost sales volume for each BNPD by the profit margin that would have been realized if there had been no price discrimination." *Id.* at 145.

The 1995 Expert Report further provided data and calculations supporting plaintiffs' claims to lost ancillary sales and pro-

---

**41.** For this reason, the parties' arguments regarding whether, and to what extent, the plaintiffs may supplement the 1995 Expert Report are not relevant to the issues present-

ed by defendants' motion because plaintiffs do not have the right to introduce new damages theories, but rather are limited to "freshening" their damages data.

spective damages. Lost ancillary sales were calculated by multiplying the increase in the annual volume of BNPDs that plaintiffs would have sold absent price discrimination "by the percentage of nonprescription sales that represent the proportion of nonprescription items purchased by prescription customers," and that amount "was multiplied by the profit margin on ancillary sales to calculate lost ancillary sales." Grass Decl. Ex. 3 at 145. Finally, prospective damages were "determined by estimating the overcharge damages and lost profits on both BNPDs and ancillary products and, where appropriate, discounting future losses to a present value using an appropriate discount rate." *Id.*

The focus of defendants' motion is their argument that plaintiffs have failed to set forth a cognizable theory of damages under the Robinson–Patman Act, which is part of their burden to prove "antitrust injury" as discussed below.

## III. DISCUSSION

### A. The Damages Standard Under Section 2(a) of the Robinson–Patman Act

The aforementioned standards for summary judgment are applied to this motion as well. Plaintiffs allege that the defendants have engaged in unjustified price discrimination in violation of Section 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a). Although § 2(a) of the Robinson–Patman Act defines certain conduct as illegal, it does not create a private right of action for damages resulting from violations of the Act. Instead, the private right of action for a § 2(a) Robinson–Patman

Act claim, as for all private plaintiff antitrust rights of action, is provided by § 4 of the Clayton Act. *See Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 853 (2d Cir.1987).

The relevant text of the two statutes governing this motion are as follows. Section 2(a) of the Robinson–Patman Act states: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." 15 U.S.C. § 13(a). Section 4 of the Clayton Act provides: "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15.[42]

In order to recover damages for a claim under § 2(a) of the Robinson–Patman Act, a plaintiff must satisfy, among other

**42.** Under the Robinson–Patman Act, a prevailing plaintiff may be entitled to monetary damages, injunctive relief and/or a declaratory judgment. *See generally John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 27 (2d Cir.1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979). In this case, plaintiffs seek only monetary damages.

things, two elements, commonly known as the "injury to competition" or "competitive injury" requirement, and "antitrust injury." Competitive injury is one element necessary to make out a *prima facie* case. "Antitrust injury" is not part of the *prima facie* case.

There are two types of "competitive injuries" generally alleged under Section 2(a), "primary line" and "secondary line." Primary line injury occurs when there is harm to the seller's competition through predatory pricing. Secondary line injury occurs when there is a harm to the buyer's competition. *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 221, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). Secondary line injury, which plaintiffs claim to have suffered, results from price discrimination between favored and disfavored purchasers. *See Hasbrouck*, 496 U.S. at 558, n. 15, 110 S.Ct. 2535; *see also Blue Tree Hotels*, 369 F.3d at 219 ("a secondary-line violation occurs where the discriminating seller's price discrimination injures competition among his customers"); *Best Brands Beverage*, 842 F.2d 578 at 585 (the competitive injury requirement may be satisfied by showing that, at the time of the price differential, "the favored and disfavored purchasers competed at the same functional level, *i.e.*, all wholesalers or all retailers, and within the same geographic market") (citing F. Rowe, Price Discrimination Under the Robinson–Patman Act,

173–180 (1962)). To establish competitive injury, plaintiffs are not required to show that the discrimination harmed competition, but only "a reasonable possibility that a price difference may harm competition." *Falls City Indus.*, 460 U.S. at 434–35, 103 S.Ct. 1282. For purposes of this motion, defendants assume that plaintiffs have satisfied their *prima facie* case and thus the competitive injury requirement as well.[43]

In addition, and separate from the *prima facie* case, plaintiffs must also establish "antitrust injury," which is "actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981) (hereinafter *"Truett Payne"*). In Robinson–Patman cases, there are ultimately two related but distinct inquiries to establish antitrust injury. First, the plaintiffs must prove the fact of antitrust injury;[44] second, they must make a showing regarding the amount of damages in order to justify an award by the trier of fact. *See Truett Payne*, 451 U.S. at 568, 101 S.Ct. 1923. Concerning the former, courts apply the ordinary standard of proof, but with respect to the latter, the standard is somewhat relaxed. As the Supreme Court explained in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114, n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (hereinafter *"Hazeltine"*), plaintiffs' burden of proving the fact of damage under § 4 of the Clayton

---

**43.** In a secondary-line price discrimination case, the favored purchaser has an advantage over its competitors who pay more for goods of like kind because the competitor can more easily lower its resale price, incur more business expenses, or make a greater profit to facilitate expansion. The Robinson–Patman Act was designed to limit the availability of price differentials to situations where there are adequate and objective economic justifications. *See* Earl W. Kintner and Joseph P.

Bauer, Federal Antitrust Law, Vol. III, 295–6 (1983).

**44.** "Antitrust injury" compels plaintiffs to show that they were in fact injured by the price discrimination, that the injury is of the type the Act was intended to prevent, and that the injury is causally connected with the violation of the Act. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

Act is satisfied by its proof of some damage flowing from the unlawful conspiracy. Once causation is established, the jury is permitted to calculate the actual damages suffered using a " 'reasonable estimate, as long as the jury verdict is not the product of speculation or guess work.' " *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir.1993), cert. *denied, Bessemer and Lake Erie R. Co. v. Wheeling–Pittsburgh Steel Corp.*, 510 U.S. 1091, 114 S.Ct. 921, 127 L.Ed.2d 215 (1994) (citing *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983)) (other citations omitted).

▪ The plaintiffs therefore must proffer evidence of some damage, with the recognition that the actual amount need not be proven to the same degree of certainty as proving some quantum of damages. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931). The "wrongdoer is not entitled to complain that [the damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise." *Id.* at 563, 51 S.Ct. 248. Stated differently, the plaintiff must come forward with substantial evidence from which a jury can determine the amount of damages from a "just and reasonable estimate of the damage based upon relevant data." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946), reh'g *denied*, 327 U.S. 817, 66 S.Ct. 815, 90 L.Ed. 1040 (1946). "Even though the burden of proving damages is lessened by the fact of antitrust violation and injury, the plaintiff is still required to put forth substantial relevant evidence." *Chrysler Credit Corp. v. J. Truett Payne Co., Inc.*, 670 F.2d 575, 582 (5th Cir.1982), cert. de-

nied, *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982). *See generally Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 398 (2d Cir.1980) (juries cannot speculate when establishing damages).

▪ The Supreme Court has rejected a mechanical approach to calculating damages simply by comparing the price differentials of defendants' transactions between favored and disfavored competitors. "Damages resulting from illegal price discrimination may not be measured merely by determining the overcharge to the disfavored buyer, *i.e.*, the excess paid by a disfavored buyer for the goods it purchased." *Truett Payne*, 451 U.S. at 557, 101 S.Ct. 1923; *see id.* at 565, 101 S.Ct. 1923 (plaintiffs have the burden of proving damages "on the basis of plaintiff's estimate of sales it could have made absent the violation") (citing *Hazeltine*, 395 U.S. at 123–24, 89 S.Ct. 1562). Antitrust injury, therefore, is an "undercharge" to the favored purchaser and not an "overcharge" to the plaintiffs, because in the absence of discrimination, plaintiffs may not necessarily have received the lower, favored price.

▪ For purposes of Robinson–Patman secondary-line cases, antitrust injury is the competitor's unfair competitive edge that is used to attract sales or profits from the plaintiffs. Thus, the injury must be traced to the competitors' competitive use of their price advantage. *See Uniroyal, Inc. v. Jetco Auto Serv., Inc.*, 461 F.Supp. 350, 358 (S.D.N.Y.1978). Proof of a lower resale price is a prerequisite to recovery in a secondary line price discrimination case because only then may the defendants' grant of an unlawful lower price to the favored purchaser possibly result in injury to the plaintiffs. *See id.* at 359. As one court has commented, "[i]f the price discrimination ... was the cause of the plain-

tiffs' injury, the plaintiffs should be able to match up their losses with gains to the favored competitors." *Hasbrouck v. Texaco, Inc.,* No. C–76–27, 1980 WL 1843, at *19 (E.D.Wash. Mar. 31, 1980), aff'd in *part,* rev'd in *part,* 663 F.2d 930 (9th Cir. 1981); *see also Alexander v. Texas Co.,* 165 F.Supp. 53, 58 (W.D.La.1958) ("Assuming that defendant committed unlawful price discrimination, plaintiff must still show that Texaco's price differences were the proximate cause of a diversion of business from him to the 12 preferred Texaco dealers.").

### B. The Parties' Arguments

### 1. The Burden of Proof

Defendants argue that plaintiffs have failed to come forward with any recognized form of damages theories for the alleged Robinson Patman Act violations. In response, and as a preliminary matter, plaintiffs rely on *Fed. Trade Comm'n v. Morton Salt Co.,* 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948) (hereinafter *"Morton Salt"*), for the proposition that an inference of antitrust injury arises "when the alleged price difference is substantial and persists over time." Pls. Opp. at 7–8. Plaintiffs argue, therefore, that under the relaxed damages standard discussed above, they are "entitled to rely on the *Morton Salt* inference of harm" as a proxy for their burden to come forward with some evidence that they sustained damages as a result of defendants' alleged unlawful conduct. *Id.* at 9. However, plaintiffs' argument is not supported by the case they cite. In *Morton Salt,* the Supreme Court held that an injury to competition might be inferred from evidence that some purchasers had to pay their supplier "substantially more for their goods than their competitors had to pay."

334 U.S. at 46–7, 68 S.Ct. 822. The Court was dealing with what the Federal Trade Commission had to show to establish liability under Section 2(a) of the Robinson–Patman Act. No Section 4 Clayton Act damage issue was involved, and thus damages were not even discussed by the Supreme Court. In relevant part, the Court held that plaintiff did not need evidence to prove "that which we believe to be self-evident, namely, that there is a 'reasonable possibility' that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of these customers." *Id.* at 50, 68 S.Ct. 822. The Court's analysis was focused exclusively on the narrow issue of competitive injury, one of the elements necessary to establish a *prima facie* case under the Robinson–Patman Act discussed above.

*Morton Salt* does not support plaintiffs' position that proof of a Robinson–Patman Act claim automatically entitles plaintiffs to damages because it "confuses the distinction between the showing of injury necessary to establish a *prima facie* case under section 2(a) of the Robinson–Patman Act with the showing of actual injury to the individual competitor-plaintiff necessary for the recovery of damages." *See, e.g., H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.,* 672 F.Supp. 724, 744, n. 27 (S.D.N.Y.1987), aff'd, 879 F.2d 1005 (2d Cir.1989). Here, defendants' primary argument is that their motion should be granted because plaintiffs have failed to prove antitrust injury as a result of the purported unlawful conduct and they have therefore also neglected to establish the existence of any damages. This is distinct from the competitive injury element discussed in *Morton Salt.* The *Morton Salt*

test does not substitute "injury to a competitor" for "injury to competition," but simply highlights one manner of showing injury to competition.

### 2. Overcharge Damages v. Other Recognized Damages

The parties recognize the controlling principle from *Truett Payne* that precludes the application of the so-called automatic damage theory—that a jury may infer the requisite injury and damage under § 4 of the Clayton Act from a showing of substantial price discrimination. *Truett Payne*, 451 U.S. at 561–62, 101 S.Ct. 1923. They differ in their view as to whether plaintiffs have proffered sufficient evidence of actual injury based on alleged price discrimination and damages specific and individualized to each defendant.

In opposing summary judgment, plaintiffs make the following arguments. First, plaintiffs argue that the 1995 Expert Report adequately explains that they are seeking "lost profits" as a result of defendants' conduct, and not merely automatic damages. They assert that they "prepared an expert report that described the but-for-price that would have been charged absent a Robinson–Patman Act violation; then calculated the difference between how much of the price differential was passed on to retail customers and therefore recovered, versus how much of the cost differential plaintiffs absorbed in the form of lost profits; then estimated the lost sales that were materially caused by plaintiffs' inability to match their competitors' retail prices that were near, or in some cases below, plaintiffs' costs to purchase the same drugs." Pls. Opp. at 15; 1995 Expert Report at 165. Contained within this damages theory are the following premises: 1) plaintiffs' profits would have been higher if

they were not required to pay more to purchase BNPDs in relation to favored purchasers, and they would have maintained some, but not all, of this price differential as profits, see 1995 Expert Report at 165; 2) plaintiffs' profits would have been higher if they were not forced to lower their prices to compete with the prices of the favored purchasers, *see id.*; and 3) absent discrimination, plaintiffs' profits would have been higher because they would have passed at least some of their lower costs on to consumers and therefore the market for BNPDs would have expanded, resulting in greater sales, and hence profits, *see id.* at 122. Each of these is addressed in turn.

### a. Claims of Lost Profits Based on Price Differentials

■ Plaintiffs claim that they have proffered evidence of damages consisting of lost profits, which they measure "according to the larger profit margin on all sales that plaintiffs would have obtained but for the competitive distortions created by defendants' two-tier pricing structure." Froot Decl. Ex. 2 at 6. In addition, as a corollary, had plaintiffs been able to purchase BNPDs at the lower prices available to favored purchasers, they claim that this would have resulted in increased profits for them. *See id.*

These two theories, however, are merely an iteration of the discredited automatic damages theory. Plaintiffs' contention is that the difference between the price charged to them as disfavored purchasers of BNPDs in comparison to the price charged to favored purchasers of BNPDs depressed their profit margin. Also, according to plaintiffs, if they had been able to purchase BNPDs at the same price as the favored purchasers, they would have

been able to divert at least some portion of the lower price to profit. Either way, plaintiffs' damages claim is predicated on the difference between what defendants charged the favored purchasers and what they charged plaintiffs—the essence of an overcharge.

Because damages may not be based on the pricing margin caused by the discrimination, but on estimates of plaintiffs' sales absent the discrimination, this theory does not support a claim for damages under the Act. As the Second Circuit held in *Enterprise Industries, Inc. v. Texas Co.*, 240 F.2d 457, 459–60 (2d Cir.1957), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957), the pricing margin caused by the illegal discrimination can only be used to quantify damages if the plaintiffs demonstrate that the favored purchasers lowered their prices in an amount equivalent to the illegal benefit they received. Because plaintiffs' damages theory, based on a lost profit margin, fails to prove that their competitors—the favored purchasers—lowered their prices in a manner which affected plaintiffs' profits—they cannot rely on the amount of the alleged illegal discrimination to establish damages even if styled as "lost profits." *See also Edward J. Sweeney and Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 118–19, n. 6 (3d Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981) ("the amount of illegal discrimination can only be used to quantify damages if the plaintiff demonstrates that favored purchasers lowered their prices in an amount equivalent to the illegal benefit they received.").

In discussing the analogous price discrimination prohibitions established by the Interstate Commerce Act, Justice Cardozo similarly explained that "[t]he question is not how much better off the complainant would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less." *Interstate Commerce Comm'n v. United States*, 289 U.S. 385, 390, 53 S.Ct. 607, 77 L.Ed. 1273 (1933). Plaintiffs' arguments relating to their claim for damages based on lost profits address only the first, irrelevant question. As such, the Court finds that plaintiffs do not advance a proper measure of damages under the Robinson–Patman Act.

In support of their argument that they have proffered evidence of antitrust injury and damages sufficient to stave off summary judgment, plaintiffs rely heavily on *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414 (11th Cir.1990), *reh'g denied*, 929 F.2d 704 (11th Cir.1991). In that case, the Eleventh Circuit held that while the plaintiff apparently had no direct evidence of either diverted sales or lost profits, it proffered evidence suggesting that the favored competitor's use of defendant's discrimination to gain a promotional advantage may have caused a substantial decrease in plaintiff's market share, and that was sufficient to preclude summary judgment on the issue of antitrust injury. Nonetheless, the Court recognized that causation "asks for something other than an inquiry into whether an antitrust violation has put a plaintiff in a worse position than it otherwise would have been in." *Alan's of Atlanta*, 903 F.2d at 1427. "The causation question asks not whether the antitrust violation caused the plaintiff's injury, but whether the banned effects flowing from that violation—as opposed to the beneficial ones—led to plaintiffs's harm." *Id.* The plaintiff proffered sufficient evidence to have its claims heard by a jury because its expert evidence revealed that as a result of the price discrimination, it lost profits to the favored purchaser. *See*

*id.* at 1426. In contrast, here, plaintiffs improperly seek damages for lost profits on actual sales caused by defendants' failure to offer them lower prices which represents the overcharge, a theory rejected by the Supreme Court in *Truett Payne*. *See also J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1540 (3d Cir. 1990), cert. *denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (proof requirements of section 4 are satisfied by direct evidence of lost sales, evidence that the substantial price discrimination reflected in the resale prices of Feeser and the favored competitors directly resulted in Feeser losing certain sales and losing profits on others, and expert report outlining the magnitude of the price difference); *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1273 (3d Cir.1995), cert. *denied*, 516 U.S. 1172, 116 S.Ct. 1264, 134 L.Ed.2d 212 (1996) (plaintiff failed to prove lost sales or profits caused by discriminatory pricing); *Walker v. Hallmark Cards, Inc.*, 992 F.Supp. 1335, 1339–40 (M.D.Fla.1997) (court required showing that "but for" defendant's discriminatory pricing, plaintiff's alleged injury would not have occurred, and suggested that favored customer's reputation for low prices may have caused plaintiff's loss of business without regard to alleged benefits from defendant-supplier); *Bryant Corp. v. Outboard Marine Corp.*, No. C93–1365R, 1994 WL 745159, at *4 (W.D.Wash. Sept. 29, 1994), *aff'd*, 77 F.3d 488 (9th Cir.1996) (plaintiff failed to show lost profits or diverted sales caused by discrimination); *Perkasie Indus. Corp. v. Advance Transformer, Inc.*, No. 90–7359, 1992 WL 296398, at *2 (E.D.Pa. Oct. 8, 1992), aff'd, 19 F.3d 644 (3d Cir.1994) (plaintiff purchaser of ballasts as component for certain light fixtures was unable to show that discrimination caused lost accounts); *S & W*

*Constr. & Materials Co. v. Dravo Basic Materials Co.*, 813 F.Supp. 1214, 1223–24 (S.D.Miss.1992), *aff'd*, 1 F.3d 1238 (5th Cir. 1993) (plaintiff failed to show that preferential prices drew sales or profits from plaintiff); *but see Innomed Labs*, 2002 WL 31521084, at *3 (requiring evidence that claimed losses were caused by discrimination; issue for jury on facts of case).

### b. Lost Sales Due to A Shrunken Market

Plaintiffs also argue that had they been able to purchase BNPDs at the same price paid for by the favored purchasers, they would have passed some of the savings on to their customers and the market for BNPDs would have expanded, resulting in greater sales and profits. *See* Grass Decl. Ex. 3 at 122. The increased market share is referred to in the 1995 Expert Report as TSI, or "total sales increase." *Id.* This theory fails because it is speculative. Plaintiffs have failed to come forward with any competent proof either that their customers would have received more prescriptions for BNPDs with lower prices, or that they would have filled those prescriptions at the retail pharmacies which plaintiffs own. It is, of course, well-accepted that speculation is insufficient to overcome a summary judgment motion.

### c. Lost sales of BNPDs to Favored Purchasers

Plaintiffs also contend that they lost sales of defendants' BNPDs by relying on a calculation which they call TSS, or "total sales shift," which purports to demonstrate that the percentage growth in the market shares of mail order and HMO-run pharmacies between 1985 and the writing of the 1995 Expert Report was caused by BNPD sales that disfavored purchasers

lost as a result of defendants' alleged price discrimination. *See* Grass Decl. Ex. 3 at 163. Fatal to plaintiffs' argument is their failure to offer any evidence to support their claim as it relates to each plaintiff. The TSS in the 1995 Expert Report is stated as a percentage, 5.1%, and reflects an aggregate amount of sales lost by all of the plaintiffs as a group.

Under the Robinson–Patman Act, plaintiffs must carry their burden of proof to demonstrate that they individually suffered damages. *See, e.g., Hasbrouck,* 842 F.2d at 1045 ("Injury to the specific plaintiff is the sine qua non of a section 4 claim, once injury to competition has been established."); *O'Connell,* 99 F.R.D. at 123 ("once an injury in fact has been demonstrated each class member would be required to adduce proof of the quantum of damages on an individual basis") (citing *Truett Payne,* 451 U.S. at 561–62, 101 S.Ct. 1923); *Kemp Pontiac–Cadillac, Inc. v. Hartford Auto. Dealers' Ass'n, Inc.,* 380 F.Supp. 1382, 1386 (D.Conn.1974) (under section 4 of the Clayton Act, a plaintiff brining a private suit must establish damage "to a specific individual"). For example, in *American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.,* 135 F.Supp.2d 1031, 1040–42 (N.D.Cal.2001), the court found that the plaintiff's expert testimony of actual damage from alleged price discrimination under the Robinson–Patman Act was inadmissible because it was entirely speculative. The expert improperly assumed damage to each individual plaintiff by averaging the alleged effects of book discounts on the industry, rather than showing damage was individually suffered. *See*

*id.* at 1041. Having found no evidence of actual damage, the court thus · granted summary judgment to the defendant on plaintiff's claims for damages. *See id.* at 1041–42.

Similarly, here, plaintiffs have failed to proffer evidence that specific plaintiff pharmacies lost sales of BNPDs manufactured by defendants to any specific favored purchaser. Exhibits D through T of the 1995 Expert Report, which purport to calculate damages "for each designated plaintiff and separately with respect to each plaintiff's sales of each designated defendant's BNPD products," do not connect lost sales of specific plaintiffs with increased sales of favored purchasers. Rather, the calculations are industry-wide and then averaged to provide a generalized damages figure ·for each individual plaintiff. *See, e.g.,* Grass Decl. Ex. 7, deposition of Jeffrey L. Harrison, plaintiffs' expert, at 281, "Q: So for purposes of calculating damages, when you calculate a total shift in market share from disfavored purchasers to favored purchasers, you're doing that on an aggregate basis for the entire group of plaintiffs in theses cases, correct? A: *It's expressed as a percentage, but yes."* (emphasis added).

The application of a general damages calculation representing harm to a class of individuals or entities, and then attempting to apply that same calculation to a specific individual or institution, offends the rule requiring an individualized damages determination. As such, this portion of plaintiffs' damages theory is untenable and cannot be accepted at the summary judgment stage.

#### d. Plaintiffs' Affidavit and Deposition Testimony

Plaintiffs further argue that they have proffered deposition testimony and affidavits to support their position that they have raised a genuine issue of material fact as to whether they suffered recognized damages under the Robinson–Patman Act as a result of defendants' pricing decisions. *See* Pls. Opp. at 20. However, in responses to interrogatories served in 1995, plaintiffs stated that the amount of sales and profits that they allegedly lost because of defendants' price discrimination would be the "subject of an expert report." Grass Decl. Ex. 2. Therefore, to the extent that plaintiffs now attempt to introduce other evidence to support their contention that they lost sales and lost profits as a result of defendants' alleged unlawful price discrimination, that evidence cannot be considered by the Court because it contradicts the 1995 Expert Report. *See Margo v. Weiss,* 213 F.3d 55, 60 (2d Cir.2000) ("the well-settled rule in this circuit [is] that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony" and noting that counsel's filing in a civil action of, *inter alia,* affidavits, in which the plaintiffs contradicted their earlier deposition testimony and interrogatory answers, in order to defeat defendants' summary judgment motion, warranted the imposition of Rule 11 sanctions) (citations and internal quotation omitted); *Mazzuocola v. Thunderbird Prods. Corp.,* No. 90–0405, 1995 WL 311397, at *9 (E.D.N.Y. May 16, 1995) ("[f]actual assertions made in an affidavit submitted in opposition to a motion for summary judgment may be disregarded if those assertions are contradicted by statements in response to interrogatories"). The affidavit testimony properly only elucidates the damages theories set forth in the 1995 Expert Report, and does not bolster plaintiffs' damages theories as against summary judgment.

#### 3. Whether Plaintiffs Have Accounted for Factors Other than Price Discrimination That Could Have Caused Their Damages

Defendants argue that the 1995 Expert Report fails to take into account factors other than the alleged unlawful price discrimination for their lost profits and sales. They provide three such factors: 1) defendants gave discounts to non-profit HMOs, which sales are exempt from Robinson–Patman Act liability under the Nonprofit Institutions Act, 15 U.S.C. § 15c; 2) "the discounts granted to so-called favored purchasers may be payments for services, such as formulary access and access to patients who are covered by third-party payor plans, which [p]laintiffs do not provide"; and 3) "plaintiffs assume that all gains in market share by all mail order and HMO-run pharmacies were attributable to unlawful price discrimination." Defs. Reply Mem. at 16–17.

In response, plaintiffs argue that "the governing law does not require that defendants' antitrust violations be the sole cause of plaintiffs' damages—only that they be a material cause of the harm." While plaintiffs are correct that they are not obligated at this stage of the litigation to exclude each and every possible explanation for the lost profits other than price discrimination, they must "attempt to account for intervening market factors," for example, the factors cited by defendants, or others. *Bigelow,* 327 U.S. at 264, 66 S.Ct. 574 (emphasizing that antitrust damages cannot be awarded for injury that is attributable to causes other than the defendant's misconduct); *The Intimate Bookshop, Inc. v. Barnes & Noble, Inc.,* No. 98–5564, 2003 WL 22251312, at * 7 (S.D.N.Y. Sept. 30,

2003) (same). In this respect, plaintiffs state in conclusory fashion that their "experts devoted considerable analysis to the issue of what caused the shift in market share from plaintiffs to HMOs and mail order, and concluded based on testimony from plaintiffs' industry expert and plaintiffs themselves that the only reason for the shift of market share and the harm to plaintiffs' bottom line was defendants' price discrimination." Pls. Opp. at 45. However, plaintiffs' argument acknowledges that their inquiry into the causes of their alleged lost sales and profits did not go beyond their belief, set forth in expert testimony and from plaintiffs themselves, that price discrimination was the cause of their claimed damages. Plaintiffs' damages theories do not attempt meaningfully to factor out other causes.

Most striking on this point is plaintiffs' statement that their "experts properly *assumed* that the principal cause of the extreme price differentials was defendants' illegal conduct." Pls. Opp. at 46 (emphasis added). This is a patently improper approach to establishing damages under the Robinson–Patman Act. *See, e.g.*, The *Intimate Bookshop*, 2003 WL 22251312, at *7 (granting summary judgment to defendants where plaintiffs' experts "were each asked to assume that the entirety of [the plaintiff's] loss is attributable to the defendants' allegedly unlawful conduct"). For this independent reason alone, defendants' motion for summary judgment is granted.

### 4. Whether Plaintiffs Have Proffered Evidence of Lost Ancillary Sales

 The 1995 Expert Report also states that as a result of defendants' discriminatory pricing practices, plaintiffs lost "ancillary sales"—revenue generated from plaintiffs' customers buying products, other than BNPDs, as a result of filling a prescription. As set forth above, because plaintiffs have failed to offer competent proof that they suffered lost profits or lost sales as a result of defendants' alleged pricing practices, they also cannot establish a nexus between those practices and the loss in ancillary sales.

Moreover, even assuming that they had established such a nexus, plaintiffs have failed to come forward with evidence that these specific plaintiffs suffered lost ancillary sales. Plaintiffs assert in conclusory form that "there is sufficient evidence in the record, in the form of both expert testimony and the testimony of plaintiffs, to entitle plaintiffs to make their presentation to a jury that as plaintiffs' sales of BNPDs fell, so did its revenue from sales of over-the-counter medicines, toiletries and sundries that bore a predictable relationship to BNPD sales." Pls. Opp. at 40. However, plaintiffs' argument fails to acknowledge that the sole basis for their claim of lost ancillary sales is an unsupported assumption that because they lost sales and profits as a result of the pricing practices, they also lost ancillary sales.

In addition, the absence of individualized proof is fatal to plaintiffs' claims for ancillary sales. *See, e.g.*, The *Intimate Bookshop*, 2003 WL 22251312, at *7. While plaintiffs correctly state that they are only required to provide "a reasonable estimation of plaintiffs' damages, not absolute or theoretical precision," Pls. Opp. at 40, they are not relieved from their obligation to prove damages, including ancillary sales, specific to each plaintiff. They have failed to sustain that burden here. Accordingly, defendants' motion for summary judgment is granted to the extent that plaintiffs seek damages consisting of ancillary sales.

### 5. Whether Plaintiffs Have Proffered Evidence of Special Damages

 Defendants assert that plaintiffs have failed to raise a genuine issue of

material fact as to their claim for special damages, which "represent losses incurred by plaintiffs who sold or terminated their business." Grass Decl. Ex. 3 at 146, 178–81. Four of the seventeen plaintiffs claim such damages, which are bottomed on the assumption that an owner of a pharmacy will value his or her pharmacy at the time of sale taking into account the profitability of the business, including the ability to sell defendants' BNPDs at top dollar. Regarding one of the plaintiffs, Fox Drug Stores, deposition testimony revealed that Revco purchased this business "to prevent Walgreens from operating in Revco home territory, that Revco never examined the financial statements, and that the price had nothing to do with a rational decision to buy a going business." Pls. Opp. at 42. Plaintiffs' response fails to acknowledge, and contradicts, this testimony. They state that the "fact remains, however, that Fox would never have sold to Revco, regardless of Revco's agenda, had the price offered Fox not been in line with the value of the pharmacy—specifically the value of the pharmacy as diminished by its reduced profitability owing to defendants' unlawful conduct." *Id.* However, the deposition testimony cited by defendants states that the purchase price of the pharmacy did not reflect the profitability of the business. Plaintiffs' burden is to proffer competent proof that there is a genuine material factual issue as to whether plaintiffs suffered special damages as a result of defendants' pricing practices. Simply stating that they did is insufficient to overcome defendants' summary judgment motion.

Similarly, plaintiffs argue that the testimony of Randall Weaver, the former owner of the pharmacy The Medicine Shoppe—that the bankruptcy and sale of his business resulted, in part, from onerous royalty payments, *see* Grass Decl. Ex. 9, attaching deposition transcripts at 14–17, 57, 107–08—supports their claim for special damages. *See* Pls. Opp. at 43. However, Mr. Weaver's statement that there is a correlation between his pharmacy's bankruptcy and defendants' pricing practices is conclusory and not supported by evidence other than his own self-serving statements. Accordingly, defendants' summary judgment motion with respect to plaintiffs' claim for special damages is granted.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment on the ground that plaintiffs have not shown that they are entitled to damages under the Robinson–Patman Act is granted.

## CONCLUSION

For the foregoing reasons, the Court DENIES the designated defendants' motion for summary judgment on the representative plaintiffs' claims with respect to the "indirect purchaser" doctrine, DENIES the motion for summary judgment with respect to for-profit staff-model HMOs, GRANTS in part and DENIES in part defendants' motion for partial summary judgment with respect to legal entities that receive rebates but do not "purchase" or take title to BNPDs, and GRANTS the defendants' motion with respect to damages.

SO ORDERED.